Jacob FREEMAN, et al., Plaintiffs,

v.

NATIONAL BROADCASTING COMPANY, INC., Defendant.

No. 85 Civ. 3302 (LBS) (KAR).

United States District Court, S.D. New York.

Aug. 20, 1993.

Jacob Freeman, plaintiff pro se.

Bernard Brown, plaintiff pro se.

Robert Garner, plaintiff pro se.

Davis, Markel & Edwards by Jay E. Gerber, Dennis H. Tracey, Gretchen Hoag, New York City, Morgan, Lewis & Bockius by Mark S. Dichter, Michael L. Banks, Philadelphia, PA, National Broadcasting Co., Inc. by Patricia Langer, Katherine Raymond, New York City, for defendant.

## OPINION AND ORDER

ROBERTS, United States Magistrate Judge:

This action was commenced in 1985 by 149 employees of the news division of defendant National Broadcasting Company ("NBC"), who contend that NBC has improperly calculated the compensation they are entitled to receive pursuant to the overtime provision of the Fair Labor Standards Act of 1938 ("FLSA"), 29 U.S.C. § 207.[1] The overtime provision provides that:

no employer shall employ any of his employees * * * for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.

29 U.S.C.A. § 207(a)(1) (West 1965 & Supp. 1992). The statute further provides that the "regular rate" includes "all remuneration for employment paid to, or on behalf of, the employee." 29 U.S.C.A. § 207(e).

Plaintiffs are members of the National Association of Broadcast Employees and Technicians, AFL–CIO ("NABET"). They work under collective bargaining agreements that establish their base pay and provide for the payment of various "fees" when they perform specific job functions on a given day. The agreements also provide for overtime payments when plaintiffs work more than forty hours in a week, at one and one-half times the plaintiffs' usual hourly compensation.

NBC calculates plaintiffs' overtime based on the hourly equivalent of their base pay alone. Plaintiffs contend that they are covered by the FLSA and that their "fees" should therefore be included in the base wage for purposes of calculating their overtime. NBC asserts that under § 13(a)(1) of the FLSA, 29 U.S.C. § 213(a)(1), plaintiffs are exempt as administrative and/or professional employees and, thus, not entitled to overtime.[2]

NBC does not dispute that under the FLSA plaintiffs' "fees" are part of their "regular rate" of compensation. See 29 U.S.C.A. § 207(e)(1)–(7). Thus, if plaintiffs are covered by the FLSA's overtime provision, they are entitled to overtime calculated on the basis of one and one-half times the hourly equivalent of their "base pay" plus their "fees."

Since the filing of the action, most of the plaintiffs have settled with NBC or been dismissed for failure to prosecute and/or fail-

---

1. The action combined 149 separate claims for relief under the FLSA; it is not a class action.

2. The court was recently advised informally that, as a result of the last round of collective bargaining, fees are now included in base pay for pur-

poses of calculating overtime. Accordingly, as to the plaintiffs covered under the new collective bargaining agreement, this decision affects only their entitlement to damages for violations prior to the inclusion of fees.

ure to comply with various pretrial orders. NBC and the remaining plaintiffs subsequently waived a jury trial and consented to trial before me pursuant to 28 U.S.C. § 636(c). Following the denial in July 1989 of cross-motions for summary judgment with respect to plaintiff Jacob Freeman, the parties agreed to sever the actions of three plaintiffs—Freeman, Bernard Brown and Robert Garner—who work primarily as newswriters and producers, in the hope that the court's determination with respect to these three plaintiffs and their job functions would provide sufficient precedent or guidance to NBC and the other plaintiffs that the remaining cases could be resolved without trial.[3]

The actions brought by Freeman, Brown and Garner were tried without a jury in February and March 1990; post-trial briefing was completed in May 1991.

I find that NBC has failed to prove that plaintiffs are exempt from the FLSA's overtime provision. I find, however, that NBC's failure to compensate employees for overtime was not a "willful" violation of the FLSA.[4]

## APPLICABLE LAW

### The Fair Labor Standards Act

The legislative history of the FLSA suggests three purposes for the overtime provision. *Mechmet v. Four Seasons Hotels, Ltd.*, 825 F.2d 1173, 1175–76 (7th Cir.1987). First, the overtime provision was intended to prevent workers who would willingly work a long week from taking jobs away from workers who prefer a shorter week. *Id.* at 1176. Second, Congress intended to spread work and reduce unemployment by imposing a penalty on employers who hire fewer workers and work them longer hours. *Id.* Finally, the FLSA was intended to protect workers from "substandard wages and oppressive working hours." *Barrentine v. Arkansas–Best Freight System*, 450 U.S. 728, 739, 101

S.Ct. 1437, 1444, 67 L.Ed.2d 641 (1981). Congress reasoned that people working longer than forty hours a week could become tired and careless and thereby endanger themselves or their co-workers. Thus, the overtime provision was intended to protect the economic and physical wellbeing of workers. *Mechmet*, 825 F.2d at 1176.

Although the FLSA sweeps broadly to encompass a wide range of workers, Congress has chosen to exclude certain employment categories from overtime protection. The FLSA expressly exempts from its overtime requirements those "employed in a bona fide executive, administrative, or professional capacity."[5] 29 U.S.C.A. § 213(a)(1). In addition, the FLSA expressly excludes certain employees in the field of broadcasting from its overtime provision. Section 213(b)(9) exempts:

> any employee employed as an announcer, news editor, or chief engineer by a radio or television station the major studio of which is located (A) in a city or town of one hundred thousand population or less, according to the latest available decennial census figures * * * except where such city or town is part of a standard metropolitan statistical area * * * which has a total population in excess of one hundred thousand, or (B) in a city or town of twenty-five thousand population or less, which is part of such an area but is at least 40 airline miles from the principal city in such area.

29 U.S.C.A. § 213(b)(9).

Plaintiffs contend that by expressly exempting small town television news editors from FLSA coverage, Congress implicitly provided protection under the statute for television news editors in larger towns and cities. NBC rejects this argument as "disingenuous and illogical," emphasizing that it does not make the claim that plaintiffs are exempt under § 213(b)(9), but rather that plaintiffs are exempt under § 213(a)(1) as

---

**3.** The parties also agreed to defer discovery with respect to damages until after determination of the exemption issue.

**4.** As permitted by Fed.R.Civ.P. 52(a), this Opinion and Order sets forth my findings of fact and conclusions of law.

**5.** NBC does not contend that the plaintiffs perform any executive functions.

administrative and/or professional employees.

The Labor Department has made the following general explanatory statement with regard to the exemption of certain radio and television employees from overtime pay requirements under § 213(b)(9):

> Some employees of radio and television stations perform work which may be exempt from the minimum wage and overtime requirements under section 13(a)(1) of the Act. This 13(a)(1) exemption applies to employees employed in a bona fide executive, administrative or professional capacity * * * as these terms are defined and delimited by regulations of the Secretary. *This exemption continues to be available for employees of radio and television stations who meet the requirements for exemption specified in part 541 of this chapter.* The section 13(b)(9) exemption, which is an exemption from the overtime provisions of the Act, but not from the minimum wage requirements, applies to a limited classification of employees employed by small market radio and television stations whose employment meets the requirements for the exemption.

29 C.F.R. § 793.2 (1992) (emphasis added). The Labor Department therefore clearly recognizes that the exemption for news employees in larger markets "continues to be available" pursuant to § 213(a)(1), notwithstanding the provisions applicable to certain small town broadcasting employees under § 213(b)(9).

## The Department of Labor Regulations and Interpretations Concerning Exemption Under § 213(a)(1)

Although the FLSA itself does not define the terms "executive," "administrative," and "professional," the statute does authorize the Secretary of the Department of Labor ("the Secretary") to define and delimit these terms by regulation. 29 U.S.C.A. § 213(a)(1). The Secretary has in turn delegated this power to the Administrator of the Wage and Hour Division of the Department of Labor ("the Administrator"),[6] 29 C.F.R. § 541, who has promulgated both "regulations" and "interpretations" defining the exemptions from FLSA coverage.[7]

Not all agency determinations deserve an equally high degree of judicial deference.[8] However, courts have recognized that the Administrator's policies with regard to the FLSA's overtime provision are based upon specialized experience and greater information than a judge would be likely to learn in a particular case. The Supreme Court has held that while the Administrator's rulings and interpretations in this context are "not controlling upon the courts by reason of their authority," they "do constitute a body of

---

**6.** The Wage and Hour Division and the position of Administrator were created by 29 U.S.C. § 204.

**7.** *See* 29 C.F.R. §§ 541.0–541.52 (General Regulations); 29 C.F.R. §§ 541.99–541.602 (Interpretations). While 29 C.F.R. § 541 draws a distinction between regulations and interpretations, these terms are often used interchangeably in the relevant case law. However, a distinction between "interpretive" and "legislative" rules has been explained in other contexts. Interpretive rules are statements providing clarification of statutory language and insight into what the Administrator thinks the statute means. They are promulgated absent legislatively delegated power to make rules having the force of law. Legislative rules are promulgated pursuant to an explicit or implicit grant of authority by Congress. The Administrator's own label is indicative, but not dispositive, of the appropriate classification to be given to a particular rule by the courts. *See Chamber of Commerce of United States v. O.S.H.A.,* 636 F.2d 464, 468–69 (D.C.Cir.1980).

**8.** Foremost, courts have a duty to enforce the unambiguously expressed will of Congress. Where there has been an express delegation of authority to an agency to elucidate a specific provision of a statute by regulation, "[s]uch legislative regulations are given controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute." *Chevron, U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984). Ordinarily, however, "administrative interpretations of statutory terms are given important but not controlling significance." *Batterton v. Francis,* 432 U.S. 416, 424, 97 S.Ct. 2399, 2405, 53 L.Ed.2d 448 (1977). Weighing an administrator's interpretation involves consideration of the validity of its reasoning, its consistency with other pronouncements and other factors giving it power to persuade. *Detsel v. Sullivan,* 895 F.2d 58, 65 (2d Cir.1990) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

experience and informed judgment to which courts and litigants may properly resort for guidance" and are often entitled to considerable weight. *Skidmore v. Swift & Co.*, 323 U.S. 134, 140, 65 S.Ct. 161, 164, 89 L.Ed. 124 (1944); *see Mabee v. White Plains Publishing Co.*, 327 U.S. 178, 66 S.Ct. 511, 90 L.Ed. 607 (1946); *cf. Dybach v. Florida Dep't of Correction*, 942 F.2d 1562 (11th Cir.1991) (regulations issued by the executive officer charged with administration of a statute are controlling when issued to fill a gap left by Congress, unless they are arbitrary).

*The Applicable Test*

■ The Administrator has promulgated regulations and interpretations that establish a "short test" and a "long test" to determine if a person is "a bona fide executive, administrative, or professional" employee. *See* 29 C.F.R. §§ 541.1(f), 541.119, 541.2(e)(2), 541.-214, 541.3(e), 541.315. Thus, there are two methods by which an employee may be found exempt from the FLSA's overtime provision. The long test, for employees earning less than $250 per week, requires that certain detailed criteria be met. The short test, applicable to employees who earn more than $250 per week, contains fewer requirements. *See id.; Dalheim v. KDFW–TV*, 918 F.2d 1220, 1224 (5th Cir.1990); *Donovan v. Burger King Corp.*, 675 F.2d 516, 518 (2d Cir. 1982).

The short test applies to employees who receive more than $250 per week in compensation "on a salary or fee basis." 29 C.F.R. §§ 541.2(e)(2), 541.3(e). According to the Administrator:

(a) An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed. Subject to the exceptions provided below, the employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work.

\* \* \* \* \* \*

(b) Minimum guarantee plus extras. It should be noted that the salary may consist of a predetermined amount constituting all or part of the employee's compensation. In other words, additional compensation besides the salary is not inconsistent with the salary basis of payment.

29 C.F.R. § 541.118; *see also Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 615–16 (2d Cir.1991), *cert. denied,* —— U.S. ——, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992); *Whitmore v. Port Authority of New York & New Jersey*, 907 F.2d 20, 21 (2d Cir.1990) (distinguishing salaried and hourly employees).

The following provisions pertaining to permissible and impermissible deductions are relevant to this case:

(a)(1) An employee will not be considered to be "on a salary basis" if deductions from his predetermined compensation are made for absences occasioned by the employer or by the operating requirements of the business. Accordingly, if the employee is ready, willing, and able to work, deductions may not be made for time when work is not available.

\* \* \* \* \* \*

(a)(4) Deductions may not be made for absences of an employee caused by jury duty, attendance as a witness, or temporary military leave. The employer may, however, offset any amounts received by an employee as jury or witness fees or military pay for a particular week against the salary due for that particular week without loss of the exemption.

29 C.F.R. § 541.118.

Plaintiffs contend that they are paid "wages" rather than "salary," and that the court must therefore apply the long test. The facts pertaining to this issue are not in dispute. Each of the plaintiffs is paid a base amount of $895 per week plus certain fees pursuant to the collective bargaining agreement between NBC and NABET. All three plaintiffs are covered by Article N of the

agreement, entitled "Newswriters Agreement—New York." Freeman Ex. 10 at 186. The fact that plaintiffs' pay varies from week to week because they are also paid fees is not inconsistent with the salary basis of payment.[9] See 29 C.F.R. § 541.118(b). Plaintiffs also contend that they are not salaried because they do not receive any fees when they are out sick, on jury duty, or away on vacation and when a show is either preempted or cancelled. They do, however, continue to receive their base pay. Under these circumstances, fees are "extras" added to a "minimum guarantee," see 29 C.F.R. § 541.118(b), and a reduction in pay due to loss of fees is not inconsistent with a salary basis of payment.

In sum, I find that plaintiffs' base compensation of $895 per week is "a predetermined amount constituting all or part of [plaintiffs'] compensation, [and is] not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. § 541.118(a). Accordingly, I find that plaintiffs are "salaried," and since their salaries also exceed $250 per week, the short test applies.

*Administrative Exemption*

To be considered an administrative employee under the short test, the "primary duty" of the employee must consist of:

1. the performance of office or nonmanual work directly related to management policies or general business operations of the employer

AND

2. the exercise of discretion and independent judgment.

29 C.F.R. §§ 541.2(e)(2), 541.214(a). In the ordinary case, "primary duty means the major part, or over 50 percent, of the employee's time" spent on administrative work. 29 C.F.R. §§ 541.103, 541.206(b). "[W]ork which is directly and closely related to the performance of the work described in § 541.2 is considered exempt work." 29 C.F.R. § 541.208(a).

According to the Administrator, the phrase "directly related to management policies or general business operations" describes "those types of activities relating to the administrative operations of a business as distinguished from 'production' * * *. In addition to describing the types of activities, the phrase limits the exemption to persons who perform work of substantial importance to the management or operation of the business of his employer * * *." 29 C.F.R. § 541.205(a). The interpretations state that administrative operations include the work of those white collar employees who are involved in planning, advising management, negotiating, and promoting sales. 29 C.F.R. § 541.205(b). "Employees whose work is 'directly related' to management policies or to general business operations include those whose work affects policy or whose responsibility it is to execute or carry it out." 29 C.F.R. § 541.205(c). The phrase "is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole." *Id.* Titles alone are of little or no assistance in determining an employee's exempt or nonexempt status. "Titles can be had cheaply and are of no determinative value." 29 C.F.R. § 541.201(b). It is therefore necessary to look closely at the duties performed.

The interpretations also explain that "the exercise of discretion and independent judgment involves the comparison and the evaluation of possible courses of conduct and acting or making a decision after the various possibilities have been considered." 29 C.F.R. § 541.207(a). Thus, for an employee to be administrative, he or she must have "the authority or power to make an independent choice, free from immediate direction or supervision and with respect to matters of significance." 29 C.F.R. § 541.207(a). The term "discretion and independent judgment" applies to the kinds of decisions "normally made by persons who formulate or participate in the formulation of policy within their spheres of responsibility or who exercise authority within a wide range to commit their

---

9. Plaintiffs' contention that they are not salaried because a "side letter" to the collective bargaining agreement *permits* NBC to hire on a per diem basis employees who perform the same functions as plaintiffs, see Trial Transcript ("Tr.") at 72–73, is frivolous.

employer in substantial respects financially or otherwise." 29 C.F.R. § 541.207(d)(2). An employee may be exercising discretion and independent judgment even though the use of such judgment consists of recommendations rather than action, and even though the employee's decisions may be subject to review. 29 C.F.R. § 541.207(e)(1). What constitutes "matters of significance" is determined by the particular facts of each case. *See* 29 C.F.R. § 541.207(d)(1). However, the interpretations caution that the phrase "the exercise of discretion and independent judgment" should not be applied to "employees making decisions relating to matters of little or no consequence." 29 C.F.R. § 541.-207(d)(2). In addition, discretion and independent judgment are distinct from "the use of skill in applying techniques, procedures, or specific standards." 29 C.F.R. § 541.207(b).

*Professional Exemption*

Employees may be covered by the professional exemption if they are either of the "learned" or "artistic" type. *Dalheim v. KDFW–TV,* 706 F.Supp. 493, 501 (N.D.Tex. 1988), *aff'd,* 918 F.2d 1220 (5th Cir.1990). Under the short test, an employee is considered a professional of the "learned" type if his or her "primary duty":

1. consists of work requiring knowledge of an advanced type in a field of science or learning

AND

2. includes work requiring the consistent exercise of discretion and judgment.

29 C.F.R. §§ 541.3(e), 541.315(a). Alternatively, an employee satisfies the short test for a professional of the "artistic" type if his or her "primary duty":

1. consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor.

**10:** The interpretations point out that "the test of whether routine work is exempt is different in the definition of 'professional' from that in the definition of 'executive' and 'administrative.' While routine work will be exempt if it is 'directly and closely related' to the performance of

29 C.F.R. §§ 541.3(e), 541.315(a). As with the administrative exemption, primary duty generally means those activities comprising the majority of the employee's work. 29 C.F.R. § 541.304. In addition, activities that are "an essential part of and necessarily incident to the professional work" are considered exempt work. 29 C.F.R. § 541.307(a).[10]

The knowledge required for work of the "learned type" is "distinguished from a general academic education and from an apprenticeship, and from training in the performance of routine mental, manual, or physical processes." 29 C.F.R. § 541.3(a)(1). According to the Administrator, knowledge of an advanced type "cannot be attained at the high school level." 29 C.F.R. § 541.302(b). The knowledge must be "in a field of science or learning," 29 C.F.R. § 541.302(c), and it "must be customarily acquired by a prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.-302(d). "The word 'customarily' implies that in the vast majority of cases the specific academic training is a prerequisite for entrance into the profession." 29 C.F.R. § 541.302(d).

Some examples of fields that employ professionals of the "learned type" are law, medicine, nursing, accounting, engineering, architecture, teaching, and various types of physical, chemical, and biological sciences. "The typical symbol of the professional training and the best prima facie evidence of its possession is, of course, the appropriate academic degree, and in these professions an advanced academic degree is a standard (if not universal) prerequisite." 29 C.F.R. § 541.302(e)(1). The interpretations specifically state that the learned professional exemption "does not include the members of such quasi-professions as journalism in which the bulk of the employees have acquired their skill by experience rather than by any formal specialized training." 29 C.F.R. § 541.302(d).

executive or administrative duties, work which is directly and closely related to the performance of the professional duties will not be exempt unless it is also 'an essential part of and necessarily incident to' the professional work." 29 C.F.R. § 541.307(b).

If the plaintiffs are not professionals of the "learned type," they may be professionals of the "artistic type" if their primary duties consist "of work requiring invention, imagination, or talent in a recognized field of artistic endeavor." 29 C.F.R. § 541.3(e). It is not enough that the work requires intelligence, diligence, and accuracy. Instead:

Work of this type is original and creative in character in a recognized field of artistic endeavor (as opposed to work which can be produced by a person endowed with general manual or intellectual ability and training), and the result of which depends primarily on the invention, imagination, or talent of the employee.

29 C.F.R. § 541.303(a).

Recognized fields of artistic endeavor include "music, writing, the theater, and the plastic and graphic arts." 29 C.F.R. § 541.303(b). In the field of writing, "the requirement is met by essayists or novelists or scenario writers who choose their own subjects and hand in a finished piece of work to their employers." 29 C.F.R. § 541.303(c)(2). For instance, the requirement would generally be met by those holding the more responsible writing positions in advertising agencies. 29 C.F.R. § 541.303(c)(2). However, as with the administrative exemption, the exemption of any professional depends upon that individual's "duties and other qualifications," rather than title. 29 C.F.R. § 541.308(a).

Under the section concerning "artistic professions," the interpretations address the applicability of the "professional" exemption to journalists in general terms, and the applicability to newspaper writers and reporters in more detail.

The field of journalism * * * employs many exempt as well as many nonexempt employees under the same or similar job titles. Newspaper writers and reporters are the principal categories of employment in which this is found.

(1) Newspaper writers, with possible rare exceptions in certain highly technical fields, do not meet the requirements * * * for exemption as professional employees of the "learned" type. Exemption for newspaper writers as professional employees is normally available only under the provisions for professional employees of the "artistic" type. Newspaper writing of the exempt type must, therefore, be "predominantly original and creative in character." Only writing which is analytical, interpretative or highly individualized is considered to be creative in nature. * * * Newspaper writers commonly performing work which is original and creative * * * are editorial writers, columnists, critics, and "top-flight" writers of analytical and interpretative articles.

(2) The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character * * * and must be considered as nonexempt work. Thus, a reporter or news writer ordinarily collects facts about news events by investigation, interview, or personal observation and writes stories reporting these events for publication, or submits the facts to a rewrite man or other editorial employees for story preparation. Such work is nonexempt work. The leg man, the reporter covering a police beat, the reporter sent out under specific instructions to cover a murder, fire, accident, ship arrival, convention, sport event, etc., are normally performing duties which are not professional in nature within the meaning of the act * * *.

29 C.F.R. § 541.303(f).

Overall, the interpretations take the view that "the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy" and that it is only "the minority whose work depends primarily on 'invention, imaging [sic], or talent.'" 29 C.F.R. § 541.303(d).

*"Tacking" of Exempt Work*

■ The Administrator has construed the statute to permit the "'tacking' of exempt work under one section of the regulations * * * to exempt work under another section." 29 C.F.R. § 541.600. Thus, even if the primary duty of an employee is not administrative or professional, an employee who spends a majority of his or her time performing a combination of administrative

and professional work is exempt from statutory protection.

### Burden of Proof

As the employer, NBC bears the burden of proving that its employees fall within an exempted category. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196–97, 94 S.Ct. 2223, 2229, 41 L.Ed.2d 1 (1974); *Idaho Sheet Metal Works, Inc. v. Wirtz*, 383 U.S. 190, 206, 86 S.Ct. 737, 747, 15 L.Ed.2d 694 (1966); *Martin v. Malcolm Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir.1991), *cert. denied*, — U.S. —, 113 S.Ct. 298, 121 L.Ed.2d 222 (1992). The employer must also establish by clear and affirmative evidence that all of the requirements of the exemption are met. *Walling v. Gen. Indus. Co.*, 330 U.S. 545, 547–48, 67 S.Ct. 883, 884, 91 L.Ed. 1088 (1947); *Donovan v. United Video, Inc.*, 725 F.2d 577, 581 (10th Cir.1984). The exemptions are to be narrowly construed against the employer seeking to assert them and their application is to be limited to those employees plainly and unmistakably within their terms and spirit. *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392, 80 S.Ct. 453, 456, 4 L.Ed.2d 393 (1960). Where the record is unclear as to some exemption requirement, the employer will not be held to have satisfied its burden. *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 900 (3d Cir.1991), *cert. denied*, — U.S. —, 112 S.Ct. 1473, 117 L.Ed.2d 617 (1992).

### Case Law Pertaining to Journalism

#### Print Journalism

The contention that reporters and editors are "learned" professionals was rejected in *Sun Publishing Co. v. Walling*, 140 F.2d 445 (6th Cir.), *cert. denied*, 322 U.S. 728, 64 S.Ct. 946, 88 L.Ed. 1564 (1944). The plaintiffs in *Sun Publishing* were writers and reporters who gathered, composed and edited news stories. They brought suit against their employer, a newspaper publisher, for withholding overtime compensation. The court stated that, as a matter of evidence and common knowledge, few newspaper employees were graduates of specialized schools of journalism and that "there are editors of long experience and trained judgment who * * * believe that the only practical school of journalism is the newspaper office." *Id.* at 449. The court concluded that the employees' work was not of a nature usually prepared for by a long course of specialized training and held that they were therefore not exempt from coverage under the FLSA. *Id.* The court did not address the employees' qualifications as "artistic" professionals.

*Adams v. St. Johns River Shipbuilding Co.*, 69 F.Supp. 989 (S.D.Fla.), *rev'd on other grounds*, 164 F.2d 1012 (5th Cir.1947), concerned whether an editor qualified under the administrative exemption. The plaintiff was the editor of an illustrated periodical, issued by his employer, which carried stories about the company's operations and personnel. The editor "conceived and executed the general make-up of the publication." *Id.* at 992. The court found that although the editor submitted the magazine to a superior for approval before it was published, he performed tasks using discretion and independent judgment that directly related to management policies or general business operations of the company, and was therefore an administrative employee. *Id.*

A television critic and columnist for the *Washington Times* was found to be exempt from the overtime provision of the FLSA in *Lewis v. News World Communications*, No. 85–3426, 1987 WL 59587, 1987 U.S.Dist. LEXIS 13964 (D.D.C. Oct. 20, 1987). The plaintiff's major assignments included preparing a daily television column, preparing lengthy critical previews of television programs and preparing weekly media columns, all based on his own evaluation, conclusions and opinions. In addition, the plaintiff "was given full discretion over the subjects and tone of his columns." *Id.* at *7, 1987 WL 59587 at *3. The court decided that Lewis qualified as a professional employee because he primarily performed exempt duties involving "individualized analyses, interpretations, and criticisms—all the product of his creativity, initiative, imagination, talent and flair." *Id.* at *15, 1987 WL 59587 at *6. The court noted that 29 C.F.R. § 541.303(f)(1) expressly exempts newspaper critics and columnists such as Lewis. *Id.*

The more recent decision in *Sherwood v. The Washington Post*, 677 F.Supp. 9 (D.D.C. 1988), *rev'd*, 871 F.2d 1144 (D.C.Cir.1989), concerned whether reporters and editors for *The Washington Post* were entitled to overtime under the statute.

In *Sherwood*, the defendant maintained that the plaintiffs were exempt as "professionals" under § 213(a)(1). Judge Gerhard A. Gesell granted the defendant's motion for summary judgment with respect to thirteen plaintiffs. The court first observed that the FLSA was enacted in response to President Roosevelt's call for legislation "to protect those receiving the bare necessities of life whose health was injured by long hours of toil. He spoke for those in the lowest income brackets, the underpaid and destitute receiving sub-standard pay. These are still the basic objects of the statute." *Id.* at 13. The court noted that the Department of Labor interpretations [11] were thirty years old and were not "categorical and indeed, given the wide variety of journalism jobs and their ever-changing characteristics, [could not] be decisive in the context of present day journalism." *Id.* at 14. Judge Gesell found the regulations and interpretations "useful but not controlling," and determined that "in each instance a court must fashion an interpretation of the FLSA which comports with congressional purpose, guided primarily by the general regulations, the overall direction taken in individual rulings and by the special facts of each situation." *Id.* at 14 (citations omitted). The court found that the plaintiffs

> produce original and creative writing of high quality within the meaning of the regulations; they have far more than general intelligence; they are thoroughly trained before employment; their performance as writers is individual, interpretative and analytical both in the writing itself and in the process by which the writing must be prepared; and their performance

is measured and paid accordingly. A special talent is necessary to succeed.

*Id.* The court therefore held that the plaintiffs were exempt from the overtime provisions of the FLSA as artistic professionals. *Id.* at 14–15.

On plaintiff Sherwood's appeal,[12] the Court of Appeals reversed, based upon its finding that "the District Court was faced with genuine issues of material fact, inappropriate for disposal on summary judgment." *Sherwood v. Washington Post*, 871 F.2d 1144, 1145 (D.C.Cir.1989). The Court of Appeals held that under the applicable interpretations, "a person's job is 'professional' by virtue of being original or creative only when the original and creative aspects constitute the *primary* or *predominant* functions of the job." 871 F.2d at 1147 (emphasis in original) (footnote omitted). The court found that Judge Gesell impermissibly made "critical findings with respect to material facts," observing, for example, that "the parties sharply disagreed over whether Sherwood's reporting is original or creative and whether it is predominantly so." *Id.* at 1147. The court held that "[d]rawing all evidentiary inferences in favor of the appellant, as required, it is certainly debatable whether Sherwood's work is primarily original and creative." *Id.* at 1148. The court remanded for a trial, noting that it offered no view on the merits of the case.[13] *Id.* at 1145, 1148 n. 5.

*Broadcast Journalism*

In *Mitchell v. Kickapoo Prairie Broadcasting Co.*, 182 F.Supp. 578 (W.D.Mo.1960), *aff'd in part and rev'd in part on other grounds*, 288 F.2d 778 (8th Cir.1961), a news editor for a radio station was found to be employed in a bona fide professional capacity. The court first noted generally that "[n]ews editors, reporters or rewrite men, as those terms are accepted and understood in the newspaper field, and as those occupations are defined by the Administrator are clearly not exempt occupations." *Id.* at 582. How-

---

11. The court mistakenly referred to the interpretations as regulations. *See Sherwood*, 677 F.Supp. at 13; *see also supra* note 7.

12. The appeals of the other plaintiffs were dismissed for failure to comply with Fed.R.App.P. 3(c). *Sherwood*, 871 F.2d at 1146 n. 1.

13. On remand, Judge Gesell recused himself; the case is now assigned to Judge Norma Holloway Johnson, before whom the case was tried in February 1993. Judge Johnson's opinion has not yet been issued.

ever, the court ultimately found that the duties of the plaintiff went "clearly beyond the scope of the limitations imposed by the statute. and by the regulations." *Id.* Although the plaintiff had the title of News Editor, the court pointed out that he was actually in charge of the news department at the station and that "he applied his special knowledge or talents with discretion and judgment." *Id.*

In *Dalheim v. KDFW–TV,* 706 F.Supp. 493 (N.D.Tex.1988), *aff'd,* 918 F.2d 1220 (5th Cir. 1990),[14] the plaintiffs were present and former general assignment reporters, producers, directors, and assignment editors employed by KDFW–TV, a network affiliate television station. The plaintiffs contended that they were required to work more than forty hours per week without overtime pay. The defendant asserted that the plaintiffs were employees working in executive, administrative or professional capacities, and therefore exempt from coverage under § 213(a)(1). Following a bench trial, the court found that KDFW had failed to prove that the plaintiffs were exempt from the FLSA provisions. *Id.*

The court in *Dalheim* recognized that the determination of whether an employee is protected by the statute is a factual question, and that prior decisions were frequently of limited value because two employees with the same job titles may be either exempt or nonexempt employees, depending on their job functions. *Id.* at 495, 504. The court also observed that while the interpretative regulations may be used for guidance and are entitled to considerable weight,

> the regulations relevant to the present case are over 30 years old. Although the age of regulations is not *per se* an infirmity, it is arguable that the considerable technical advances that have taken place in the television industry and in broadcast journalism since 1958 have affected the weight to be given these interpretative guides.

*Id.* at 496.

The court began by setting forth in detail the plaintiffs' duties at KDFW. *Id.* at 496–

501. The court then turned to KDFW's contention that the reporter, producer and director plaintiffs were exempt as "learned" or "artistic" professionals. *Id.* at 501–06. The court found that despite the emergence of many journalism schools and degrees, the plaintiffs were not "learned" professionals, because the record showed that "broadcast journalism does not customarily require a knowledge of a field of science or learning." *Id.* at 502. Furthermore, the court noted that KDFW itself did not require its employees to possess a college degree. The court found that the plaintiffs followed a path of starting in small markets and advancing to larger ones, and that their performance was enhanced by work experience which was considered "more akin to 'an apprenticeship and * * * training' rather than 'intellectual instruction and study.'" *Id.*

The court acknowledged that "general assignment reporters *can* be artistic professionals because significant technological advances in how broadcast news is gathered and presented to the viewer have required that reporters produce work that is original and creative in character, the result of which depends primarily on the invention, imagination, or talent of the employee." *Id.* at 503 (emphasis in original). The court found, however, that the defendant had failed to "prove by a preponderance of the evidence that the work of its plaintiff-reporters is so 'primarily' inventive or imaginative, or routinely original and creative, that the court can find they are artistic professionals." *Id.* at 504. Relying for guidance on § 541.303 of the interpretations, the court concluded that "[l]ike print journalists, KDFW reporters primarily use intelligence, diligence, and accuracy to report facts." *Id.* at 505. The court noted that the reporters were "told which stories to cover and * * * informed of the focus or angle of the story before they cover it. * * * They use essentially a standard format of pictures and sound to cover most stories." *Id.* Thus, the reporters did not depend "principally upon creativity, invention, or imagination." *Id.*

---

**14.** *Dalheim* was decided after the district court's decision in *Sherwood,* but before the D.C. Circuit reversed.

The court found that KDFW producers were not "artistic" professionals because the work they did was found to be "most closely akin to that of the 'rewrite man' * * *. [They] usually revise work prepared by reporters, wire services, or earlier broadcast news stories." *Id.* at 506. Thus, their work was not "creative and original". The court also rejected "the contention that producers primarily use invention, imagination, and talent in formatting a newscast." *Id.* The court found that producers followed "accepted conventions in selecting lead stories, grouping related stories, pacing the broadcast, avoiding monotony in sequencing forms of stories, and incorporating stories that can be added or dropped." *Id.*

The court similarly found that the directors were not artistic professionals because they did not primarily rely on invention, imagination or talent in performing their job. "Many of their decisions are obvious because station management has prescribed the 'look' of the newscast in much detail. * * * [D]irectors operate principally within accepted guidelines and do not function primarily upon the basis of invention, imagination or talent." *Id.*

Nor did producers, directors and assignment editors qualify as administrative employees.[15] The court found that the producers did not "perform, as their primary duty, work that is directly related to management policies or general business operations." *Id.* at 507. Their work was "not related to the 'administrative' aspects of the business and * * * not of importance to the business as a whole to a 'substantial degree.'" *Id.* The court found that the "the *nature* of the [employee's] work, not its ultimate consequences[,]" is the focal point of the regulations. *Id.* at 508 (emphasis in original). Thus, even though the producers' work could have a substantial impact on the broadcast, the work itself was not "directly related to management policies or general business operations." *Id.* (quoting 29 C.F.R. § 205(c)(2)). The directors were found not to be administrative employees because their

work also failed to meet the "'directly related' element of the administrative employee exemption." *Id.* In addition, the directors were not exempt because their work did not "require the exercise of discretion and independent judgment." *Id.*

Finally, the court found that KDFW's violation of the FLSA was not "willful." The court noted that "[t]o be a 'willful' violation under the FLSA, the employer must have either known or shown reckless disregard for whether its conduct was prohibited by the FLSA." *Id.* at 510 (citing *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 108 S.Ct. 1677, 100 L.Ed.2d 115 (1988)). The court found that the case presented questions of first impression regarding the exemptions of the various broadcast journalism positions, and acknowledged that "[t]he determinations whether reporters are artistic professionals and whether producers are administrative professionals are close ones." *Id.* at 511.

The Fifth Circuit affirmed, finding that the district court properly applied the statute and regulations, and that the record supported the district court's conclusion that the employees in *Dalheim* were not exempt as executive, administrative or professional employees. *Dalheim v. KDFW–TV,* 918 F.2d 1220, 1223 (5th Cir.1990). The court emphasized that the inquiry into exempt status under § 213(a)(1) "remains intensely factbound and case specific," *id.* at 1226, and observed that the trial judge "painstakingly catalogued the tasks performed by each type of employee, and related how each task contributes to producing a KDFW newscast." *Id.* at 1227–28.

With respect to general-assignment reporters, the court specifically rejected KDFW's contention that the district court gave undue weight to interpretation § 541.-303(e) and (f), "thus blinding itself to the realities of modern broadcast journalism." *Id.* at 1228. It held:

To the extent that a district court finds in the interpretations an analogy useful in deciding the case before it, it may rely on the interpretations as persuasive evidence

---

**15.** KDFW did not contend that reporters were exempt as administrative employees. *See Dal-*

*heim,* 706 F.Supp. at 506.

of both Congress's legislative and the Secretary's regulatory intent. At the same time, should a district court find the concepts expressed inapposite to the facts before it, the court is free to engage in its own application of § 13(a)(1) and the pertinent regulations.

*Id.* The Court of Appeals also rejected challenges to the district court's construction of the term "primary duty," its findings regarding the administrative exemption, and its alleged failure to "tack" exemptions under § 541.600. *Id.* at 1227–28, 1229–31, 1232.

## THE EVIDENCE AT TRIAL

### *Overview*

The NBC News Division employs approximately 1000 people worldwide and uses hundreds of freelancers to gather and produce news stories. It maintains approximately twenty-two domestic and foreign news bureaus, and its news programs are broadcast daily over 200 NBC television affiliates throughout the United States and certain foreign countries. The News Division produces regularly scheduled news programs such as *Nightly News, Weekend Nightly News,* the *Today* show, *Sunrise* and numerous news specials, documentaries and on-the-spot coverage of special events. *Nightly News,* and its weekend version, *Weekend Nightly News,* are the best known programs produced by the NBC News Division. *Nightly News* has the highest viewing of any NBC news program, reaching nearly fifteen million people daily. It also generates the largest amount of revenue for the Division, and is critical to each of NBC's television affiliates, all of which carry the program on a daily basis. In most of the country, the program airs at either 6:30 or 7:00 p.m., when it competes head-to-head with the comparable daily news programs of the other two major networks, as well as other local and cable television programs.

Plaintiff Freeman is a newswriter for *Nightly News,* which is anchored by Tom Brokaw, who also serves as the program's managing editor.[16] Freeman is a member of a core production/editorial group consisting of the executive producer [17] William Wheatley; senior producer Cheryl Gould; foreign and domestic producers Mark Kusnetz and Jack Chesnutt, respectively; news editor, Sandor Polster; foreign and domestic newswriters, Edward Deitch and Freeman, respectively; and Tom Brokaw, all of whom work closely together in the NBC newsroom. In addition, *Nightly News* employs dozens of on-air reporters or "correspondents," field and segment producers, researchers, graphic artists, satellite coordinators, tape producers, and a large contingent of technical and engineering specialists who deal with cameras, tape editing, lighting, sound and other aspects of the production of the program. Only Brokaw and on-air reporter/correspondents appear on camera.

The *Weekend Nightly News* program airs on Saturday and Sunday and is produced by different individuals than those on the *Nightly News* staff. Plaintiff Brown works for *Weekend Nightly News.* Until January 1990, Brown served as the domestic producer, and also filled in as senior producer. The other producers were: executive producer William Chesleigh; senior producer Dennis Sullivan (who served temporarily as executive producer in Chesleigh's absence); and foreign producer Donald Morfoot. Since January 1990, when John Terenzio became executive producer, Morfoot has been the senior producer and the titles of domestic and foreign producer have been eliminated; Brown's title is now simply "producer." None of the producers appears on camera. On Saturday and Sunday, when the show is on the air, the weekend staff works in the *Nightly News* news room used by Tom Brokaw and his staff during the week. During the week (Wednesday through Friday), they are located in other NBC offices.

WNBC–TV, often referred to as the "local news," is a local television station, owned and operated by NBC, that focuses on news in

---

**16.** This Opinion speaks as of the time of trial. Some of the witnesses at trial are no longer in the same positions, or do not have the same job functions; others are no longer with NBC.

**17.** Producers who work in the newsroom are called "show producers," as distinguished from "field producers." Tr. 1558 (Gould).

the tri-state area of New York, New Jersey and Connecticut. Plaintiff Garner is a WNBC field producer, who reports to executive producer Clare Friedland, and to news director Paula Walker; William Moll is the vice president and general manager of WNBC. Garner generally covers daily news stories in the field, with or without a camera crew, sometimes in collaboration with an on-air correspondent. Garner occasionally participates in the reporting and production of news features that are aired over several days. As a rule, only the WNBC anchors and on-air correspondents appear on camera, although Garner has done so in unusual circumstances.

During the course of the trial, the court heard nearly twenty witnesses, including plaintiffs, their colleagues and supervisors, NBC executives, and two professors of journalism. The court viewed the entire *Nightly News* broadcast for January 15, 1990, and reviewed the source materials available to the newswriters, the scripts as drafted by the newswriters and as read on air after editing. The court also viewed portions of other NBC and WNBC broadcasts in which plaintiffs played some role, read hundreds of scripts, and compared numerous scripts to newspaper and wire service copy on the same stories.

The testimony on both sides was frequently crafted (one is tempted to say "scripted") to conform to the language of the regulations, interpretations and court decisions that each side perceived to be supportive of its position. Accordingly, a good deal of the testimony consisted of opinions and legal conclusions about the work performed by the plaintiffs, rather than neutral descriptions of their regular tasks and how their duties relate to a particular story or broadcast—or to the general mission of NBC News. Moreover, the witnesses were frequently drawn to extreme characterizations, such as "routine" and "mechanical" (plaintiffs) and "talent of the highest degree" (defendants). This testimony tended to throw into sharp relief the remarkably ironic nature of this lawsuit, in

which writers and producers at the pinnacle of accomplishment and prestige in broadcast journalism, in order to increase their remuneration, present themselves as simple writers, editors and reporters, who are forced to fit the news into the rigid molds imposed upon them by their employer; while NBC extols the plaintiffs as "the best and the brightest" in the most competitive media market in the country, but argues that they are therefore too creative, talented and independent to merit increased pay.

It is against this backdrop that I set forth the evidence presented at trial.

### Testimony Presented by Plaintiffs [18]

#### Jacob Freeman

I. *Background and General Job Description*

Jacob Freeman has been a television newswriter for *NBC Nightly News* with Tom Brokaw for more than five years. In this position, he writes "roughly one-third of the news copy that Mr. Brokaw reads on the air[,] [u]sually between five and ten script pages each night, with each page representing about fifteen or twenty seconds of the half-hour program." Tr. 24. As one of two newswriters for *Nightly News*, Freeman tends to focus on domestic news, while Ed Deitch, the other *Nightly News* writer, focuses primarily on foreign news. *See* Tr. 26, 96–97, 154–55. Each writer is responsible for approximately one-third of the nightly show; Brokaw, the anchor and managing editor, writes the other third. Tr. 97–99.

Freeman graduated from Fordham University in 1953, where he majored in philosophy and minored in journalism. Tr. 90–91. After college, he became a general assignment reporter for the *Montgomery Advertiser*, a morning newspaper in Montgomery, Alabama. Tr. 91, 714. He has held various positions at the *New York Post*, and was an associate editor at *Gentlemen's Quarterly* magazine. Tr. 91.

In 1968 Freeman obtained a master's degree in education from New York University,

---

18. In addition to their own testimony, plaintiffs offered the testimony of Chesleigh, Miller, and Ryttenberg. The testimony of these witnesses is set forth or cited where appropriate in this section, and in the section on testimony by NBC witnesses.

where he took a course in television news. Tr. 90–91. Freeman then worked for WCBS television news as a newswriter and producer of the 1:00 a.m. news; between 1970 and 1973, Freeman worked for a company making documentary and political films. Tr. 92–93.

Freeman joined NBC as an assignment desk editor at WNBC, and later worked as an associate producer of *News Center 4*, and an associate producer for *Live at Five*, a news program featuring live interviews. Tr. 93–94, 715–16. He joined *Weekend Nightly News* in 1983 and in June 1984 began writing for Brokaw on *Nightly News*. Tr. 94–96.

Freeman's official job title is newswriter.[19] Tr. 24; *see* Freeman Ex. 10 at 181–204. Freeman is aware of "no entrance exam or qualification test, no specific degree or certification that NBC recognizes or requires as establishing one's ability to perform the work that I perform." Tr. 42. He testified that "NBC has never prepared and never made public a job description of what I do."[20] Tr. 44. Nor, to his knowledge, has his performance ever been evaluated by NBC against any published or unpublished criteria or standards. *Id.*

Freeman never receives a by-line or a credit that is attached to a specific piece of writing. Tr. 38. Show credits run only once a week, and do not differentiate Freeman's writing from anyone else's. Tr. 39. Freeman has never received any awards or prizes for his work, and has no knowledge of his work—or similar work—ever being submitted for an award. Tr. 42.

Freeman has taught writing courses at various colleges, as well as a course at NYU in 1989 called "Broadcast News." Tr. 285–

88. He is a member of Sigma Delta Chi, also known as The Society of Professional Journalists. Tr. 724–25.

## II. *General Daily Schedule*

As noted above, Freeman is part of a core editorial/production group composed of the anchor and managing editor (Brokaw), executive producer (Wheatley), senior producer (Gould), domestic producer (Chesnutt), foreign producer (Kusnetz), foreign newswriter (Deitch), and domestic newswriter (Freeman). Tr. 36–37; *see* NBC Ex. R (diagram of *Nightly News* newsroom). The executive producer has overall responsibility for the content of the newscast. Tr. 36, 127. The domestic producer coordinates coverage of all the news in the United States, with the exception of Washington, which is handled by the senior producer, who also "edits all scripts as a backstop to [the news editor]." Tr. 36. The foreign producer coordinates coverage of the rest of the world. Tr. 36.

### A. *Morning Meeting*

Freeman has essentially the same schedule every day. Tr. 25. He arrives at work at 9:30 a.m. and has twenty minutes to "bone up" for the regular 9:50 a.m. morning meeting and conference call. Tr. 25, 132–34. To "bone up," Freeman looks through the morning papers and reviews the news that the *Today Show* has reported. Tr. 134–35. Freeman also reviews information that is available on a computer at his desk, including wire service copy and "desk logs" from the NBC assignment desk,[21] which list the stories available from NBC and free-lance reporters and the coverage being planned for the day. Tr. 134–35, 720–22. The wire ser-

---

**19.** When Freeman joined *Nightly News*, all writers had the title of "editor," which entitled them to certain additional fees. In 1988 the title changed, causing writers to lose the additional fees, and resulting in the filing of a grievance. Tr. 117–18. Freeman has continued to call himself an "editor" in order to preserve his position in the grievance proceedings. *Id.*

**20.** Freeman testified that under "cross-over" provisions sought by NBC in negotiations with NABET, NBC would have "a right to assign and has assigned members of the engineering staff to perform various newswriter functions." Tr. 42–

43; Freeman Ex. 2; *see also* Tr. 2370–2453; NBC Ex. CY. According to Freeman, NBC has sought to expand the use of cross-over newswriters "without any regard for qualifications or so-called professional status." Tr. 43. NBC's director of labor relations described NBC's proposal as "experimental," and testified that it would be "limited to a few choice people." Tr. 2376, 2387.

**21.** The NBC assignment desk co-ordinates news coverage in the United States and around the world. *See* Tr. 58; *see also* Tr. 1348–49 (Garner).

vices provide "digests" and "urgents,"[22] which enable Freeman to see what is available from the wire services without reading all the wires. Tr. 135–36, 722.

At the 9:50 morning meeting, the "major event" is the conference call, involving *Nightly News,* the assignment desk and bureau chiefs from the domestic news bureaus, to review the news coverage being planned for the day and learn the "offerings" from the bureaus. Tr. 141–45. Many members of the *Nightly News* staff are present for the call.[23] Tr. 145. After the call everyone leaves except the producers, news editor, writers, and the graphics person.[24] Tr. 146–47. At the meeting, the producers discuss the stories to be covered and the ways to cover them. Tr. 148–49. Freeman testified that he "mostly listen[s,]" but occasionally participates in these meetings. Tr. 149–51. Sometimes he suggests stories based on material he has read, Tr. 150, but "seldom" gives an opinion on the "news value" of a story being discussed. Tr. 152. The morning meeting usually ends between 10:15 and 11:00 a.m. Tr. 25, 153.

### B. *"Reading In" and "The National Outlook"*

After the morning meeting, Freeman returns to his desk and begins "reading in," which involves reading and printing out from his computer domestic stories of interest, and organizing them into stacks according to subject matter. Tr. 25, 153. Freeman also reads and clips stories from newspapers and magazines. Tr. 25. He does this until he goes to lunch, typically from 12:00 to 1:00 p.m. Tr. 25.

At approximately 2:30 or 3:00 p.m., Freeman receives a copy of the "List." Tr. 25–26. The List is a summary of the day's top stories prepared by Polster, the news editor.

*Id.* When Freeman receives the List, he goes through his own stacks of wire copy and other clippings, and puts aside all of the stories Polster has listed. *Id.* Freeman then takes the remaining stories and compiles a "secondary" domestic news list called the "national outlook," in which he groups stories under appropriate headings.[25] *Id.;* *see, e.g.,* Freeman Ex. 1 (containing national outlooks prepared by Freeman in December 1989 and January 1990); NBC Ex. B (national outlooks prepared by Freeman for December 22, 1989 and January 22 and 26, 1990); *see generally* Tr. 86–89, 107–112, 157–181.

Freeman estimated that he spends about five hours a day compiling the national outlook, which normally runs the length of a legal size page. Tr. 67–68, 86. The national outlook does not contain everything reported by the wire services, but Freeman includes all of the stories that appear in the wire service digests, unless he believes that the executive producer would have no interest. Tr. 110–11. Freeman discards "marginal" stories when his list is getting too long.[26] Tr. 170. This entails "creating or drawing a cut off line below which I know the stories would not possibly have any interest." Tr. 162.

Since Freeman's national outlook comes out after the List, it may include stories that have broken after the List was compiled, and which will be reported on *Nightly News.* Tr. 67, 110–112, 159–60. Freeman testified that on average, stories from his national outlook get on the show about once a day. Tr. 109, 160. If in preparing the national outlook or reading in Freeman sees something he thinks the domestic producer may wish to pursue, he calls it to his attention. Tr. 129–30.

Freeman testified that preparing the national outlook is not necessary to writing for

---

**22.** "Urgents" are stories designated by the wire services as having special significance. Tr. 556 (Brown).

**23.** Brokaw may or may not be present for the conference call; he sometimes participates by telephone. Tr. 146.

**24.** *Before Polster became news editor, the writers did not stay for the meeting following the morning conference call.* Tr. 147–48.

**25.** Deitch prepares a similar list of secondary foreign stories. Tr. 26.

**26.** Wheatley once asked Freeman to narrow his list because there were too many "marginal stories." Tr. 171–73.

the *Nightly News* broadcast. Tr. 70. During Freeman's first year with *Nightly News*, Freeman "read in to soak up the news and be in the flow of development," but prepared nothing orally or in writing, unless there was something of special interest to bring to the attention of the executive producer. Tr. 69, 158–60; *see* Tr. 226–29. Freeman pointed out that outlook lists were not required until Wheatley became the executive producer in 1985, that *Weekend Nightly News* has no such lists, and that Brokaw writes one-third of the show without preparing such a list. Tr. 69, 158–59. According to Freeman, the list is primarily intended "to spare [the executive producer] the drudgery of going through the wires." Tr. 157. Freeman acknowledged that in preparing the national outlook, he uses news judgment, which he described as "the judgment the journalist employs in reporting the news * * * Basically what makes a story newsworthy is whether it's interesting or important or significant." Tr. 163. He also considers "network threshold" in the sense of "a level of interest that is presumed to encompass the whole country." Tr. 178.

### C. *Afternoon Run–Down Meeting*

Freeman is usually finished with the national outlook by 3:30 or 4:00 p.m. Tr. 26. At 4:30 p.m., there is a "run-down" meeting with the producers, news editor, writers, production assistants, and the graphics person. Tr. 26, 182. At this meeting, Wheatley "literally dictates, while the rest of us take notes, the content of that evening's newscast." Tr. 26; *see* Tr. 182. Wheatley also "dictates" the order of the stories, their length, the types of graphics,[27] and the format of the coverage, *i.e.*, whether an item will be a "tell story," a "voice-over," a "sound-on-tape," or a "reporter package." Tr. 26–27; *see infra* pp. 1126–28. Wheatley also specifies which aspects of the story he wants to have stressed and which he wants ignored. Tr. 27. In sum, Wheatley gives "a very detailed blueprint of what the writers must write." Tr. 27; *see* Tr. 183–84; NBC Ex. U (run-down for January 4, 1990). Before the end of the meeting at 5:00 p.m., Brokaw gives Freeman his writing assignments. Tr. 27, 191. There are usually five segments on *Nightly News* and Brokaw writes the first and the last himself.[28] Tr. 189.

### D. *Writing the News*

Freeman generally has one-and-one-half hours to write four or five items.[29] Tr. 186. When he receives his assignment Freeman knows the subject, its format, length, position in the broadcast and "what graphic has been ordered for it." Tr. 191. After the run-down meeting, Freeman is frequently given additional information about his assigned stories by Polster, who may also make suggestions as to emphasis and key phrases. Tr. 27–28. Freeman may also speak to reporters in the field, or to correspondents who specialize in subjects such as law and science.[30] Tr. 29–30. Freeman also testified that ninety-five to ninety-eight percent of what he has read during the day is of no value in writing his assigned stories, and that when he is assigned to write stories he has not been following, he depends on the wire copy. Tr. 187–88. Freeman acknowledged, however, that "reading in" enables him to

27. Freeman testified that there are sometimes discussions concerning graphics, and that he has suggested graphics a number of times. Tr. 192–93. Wheatley, however, always makes the ultimate decision. Tr. 27, 192–94.

28. On rare occasions, when a segment is lengthy or when Brokaw is not the anchor, Freeman or Deitch may write the first or last segment. Tr. 189–91. Freeman has only written the first segment twice. Tr. 190.

29. Most stories are written, edited, timed, printed and inserted in the show script before 6:30 p.m., but Freeman is often assigned to write late-breaking stories or updated versions of earlier

stories while the program is actually on the air. Tr. 64, 302. For example, Freeman is often told, "Jack, we need 15 seconds, 20 seconds on this." Tr. 302. Freeman stated that these stories "must usually be written in a [matter] of minutes and usually must be completed in time to be inserted at specific points within the time frame of the show." Tr. 64–65. Occasionally, Polster will assign Freeman to follow a story, such as an NBC poll, during the day and to write it early. Tr. 66.

30. Freeman has no contact with correspondents until he knows his assignments. Tr. 719–20.

perform his job "more effectively" and "more intelligently." Tr. 153. Freeman generally leaves work at 7:30 or 8:00 p.m. Tr. 132.

### III. Types of Writing

Freeman testified that he most frequently writes copy for *Nightly News* in three formats: "intros," "voice-overs," and "tell-copy" or "tell-stories." *See* Tr. 26–34, 103–04. He also writes headlines and digests.[31] Tr. 53–63, 104–07.

#### A. Tell Story/Tell Copy

A "tell story" or "tell copy" item is a story that the anchor reads without pictures, although occasionally the story is accompanied by a graphic. Tr. 277–78; see, e.g., NBC Exs. AK, AL, AM, AN, AP, AW; Freeman Ex. 1 (containing, *inter alia*, examples of tell stories). When Freeman writes a tell story, the copy he writes will constitute all that NBC is going to say about that particular story. Tr. 279–80. A tell story almost never runs more than twenty seconds. Tr. 279.

#### B. Intros

An "intro," or "lead-in," is what Freeman writes for the anchor to read on camera as an introduction to a story.[32] Tr. 30, 114–16; *see* Tr. 258–67, 270–77. Frequently an intro introduces a "reporter's package," which is a reporter's complete report on tape. Tr. 27. Freeman must locate the reporter's script and then check with the appropriate producer to make sure the script has not been altered in any significant way. Tr. 28, 253–54. For example, Freeman may have to supply a "first reference" to a subject that has been edited out of the reporter's pack-

age.[33] Tr. 27–28; *see* 253–54. Reporters' scripts often include a suggested intro which Freeman will use, if possible.[34] Tr. 28–29, 251–52. In writing intros Freeman also considers the story's position within the newscast, "whether the other side of the controversy is being represented," and the headlines and graphics chosen by Wheatley. Tr. 29, 252–56. After writing the intro, Freeman usually checks with the reporter or appropriate producer to ensure that the facts are correct, especially if the material is technical or very complex. Tr. 29–30, 250–51; *see* Tr. 266–77, 719–20. Freeman also looks at the wires for additional information. Tr. 249–50.

Freeman also writes "intros" for "sound bites" or "sound-on-tape"—a short film clip of somebody talking, for which the producer usually gives him a transcript, called a "verbatim" of the statement. Tr. 33. Occasionally, Freeman is asked to choose a sound bite for a particular story, but it is more often chosen by a correspondent or a producer. Tr. 33. Freeman also writes "tags" or "outros" to follow a reporter package or sound bite. Tr. 34.

#### C. Voice–Overs

A "voice-over"—also referred to as a VO-SOT (voice over sound on tape), is a script read by the anchor (off camera) while a film clip or picture is shown. Tr. 30, 231–35; *see, e.g.*, NBC Exs. C through H (voice-overs written by Freeman). When Freeman is asked to write a voice-over, he checks with a tape producer to see whether the tape is in the house or when it is expected. If the tape is available, Freeman usually looks at it; if

---

**31.** Freeman Exs. 1, 16 and 18 contain several hundred examples of Freeman's writing between December 1989 and March 1990.

**32.** Freeman and NBC submitted numerous examples of intros drafted by Freeman. *See, e.g.*, Freeman Exs. 1, 3, 4, 5, 16, 18; NBC Exs. Z, AA, AB, AE, AF, AJ, AO.

**33.** For example, if the reporter's first statement will be "the train was traveling 50 miles an hour when the accident happened," Freeman will have to state in the intro "what train it was that got involved in the accident and what happened to it." Tr. 28.

**34.** Freeman explained that this is not always possible because the suggested intro may be too long, may fail to deal with the problem of first and second references, or may fail to take into account the story's position within the newscast. In other cases, a reporter "will give a very featurish kind of suggest[ed] intro when we are playing the story kind of high up, and it needs a harder kind of, newsier kind of style. Or the reporter-suggested intro would not take into account the graphic that Mr. Wheatley has prescribed to go with the intro, or the fact that this story follows another story and there has to be some sort of connection made between the two that the reporter didn't even know about." Tr. 29.

not, he gets a description of its contents. Tr. 30–32. Freeman either writes the words and the tape producer edits the pictures to match, or the tape producer cuts the tape first and Freeman matches the words to the pictures. Tr. 32–33, 236, 238. The sequence depends upon the availability of the tape at the time Freeman is writing. Tr. 30–33. Freeman must "coordinate and collaborate" with the tape producer, editor and cutter. Tr. 33, 236–37. Frequently, Freeman must provide additional facts or details that are not being shown in the pictures. Tr. 234. At other times, Freeman writes nothing (silence) and lets the pictures speak for themselves. Tr. 234. Voice-overs may also require intros and outros. Tr. 31. Freeman explained that there are "two tricks in writing voice-overs. The first trick is to say what you see. * * * The other principle is that the words have to end when the pictures end. It's a little bit like a newspaper caption." Tr. 232.

Freeman acknowledged that "writing to picture" is "a specialized kind of work," that "most writers don't have much practice with," Tr. 244, but disagreed with Sandy Goodman, a former plaintiff in this case, who wrote in a 1972 article for *Writers Digest* that "mastering [the process of voice-over, writing to a film,] is one of the most challenging of the television news writer's jobs." Tr. 243; NBC Ex. X. Freeman testified, "I've never had trouble with writing voice-overs." Tr. 244.

Freeman was also asked to comment on the following excerpt from "ENG: Television News and the New Technology" (NBC Ex. Y), a book by NBC's expert witness, Professor Richard Yoakum:

[B]ecause the words and the pictures must work together to tell the story, writing text for a voice-over requires that the writer have not only a solid grasp of the fundamentals of television news writing, but also an understanding of how a motion picture story is put together, the role and function of narration, and the interdependence of the visual and sound portions. The work of the writer and the work of the videotape editor must be· coordinated so that the visual and aural ingredients are unified and fitted into a third entity, the complete story.

NBC Ex. Y; *see* Tr. 245. Freeman did not disagree with the excerpt, Tr. 245–46, but noted that he wrote voice-overs on his first night at WCBS without any previous practice or training. Tr. 717.

### D. Headlines and "Teases"

Freeman testified that he rarely writes headlines because Brokaw always writes them himself.[35] Tr. 104. Headline writing is extremely brief and involves "voicing over picture." *Id.* The process requires coordination with the producer or reporter responsible for the story being headlined in order to determine which pictures are available. *Id.* Freeman is not involved in selecting the pictures. Tr. 105. Freeman occasionally writes "teases," which only tell part of an upcoming story and are designed to entice the viewer. Tr. 106–07.

### E. News Digests

Freeman also writes complete scripts for "news digests"—also known as "snippets" or "News at this Hour"—which are read by an anchor. *See* Tr. 53–54; *see, e.g.* Freeman Exs. 6 through 8 (digest scripts). The evening digests are aired at 9:00 p.m. and 10:00 p.m., but are pre-taped at 7:30 p.m. Tr. 70.[36] Digests generally have three to four headlines and run thirty seconds. Tr. 53, 56. Freeman spends between three and five hours each week writing these digests. Tr. 70. Freeman and Deitch alternate the evening digests, which take about one-and-one-half hours to write and involve staying late. Tr. 70, 86, 117.

The writer of the digests decides which stories will be featured. Tr. 56. However, the first and last paragraphs of the digests, which take up approximately eight of the

---

**35.** Freeman has only written headlines on two or three occasions, in Brokaw's absence. Tr. 104.

**36.** Prior to October 1989, Freeman also wrote the afternoon digests, which air at 2:00 p.m. and 3:00 p.m., but now only does them occasionally because another writer has been assigned to perform this task. Tr. 55, 87, 117.

thirty seconds, are formulas that the writers are required to use. Tr. 53–54. Management has also specifically instructed writers for News at this Hour to use "a sharp active headline style emphasizing the latest stories." Tr. 63; Freeman Ex. 9. Freeman testified that he is required to submit the news digests to the news editor for approval, and that the anchors can decide to change them at any time. Tr. 60–61; see Tr. 54–57, 2783–84. Freeman considers writing three or four headlines for twenty-two seconds "routine editorial work." Tr. 56.

Freeman acknowledged that newswriting involves selection of facts, organization and structure, that some newswriting contains "elements of creativity" in the way words and elements are chosen, and that creative writing is not limited to fiction. Tr. 282–83, 727–30. Freeman testified, however, that he "does not do analytical writing," and does not "explain" the news, except to provide a brief definition. Tr. 723, see Tr. 333–34. Unlike Brokaw, he does not make "value judgments." [37] Tr. 51.

Freeman also stressed that "everything" he writes is "rewritten from some other source," most frequently wire copy and newspapers, but also from reporter's scripts, notes and suggested lead-ins, as well as oral and written instructions from the producers and "offerings lists" from the assignment desk.[38] Tr. 34–36, 2793; see, e.g., NBC Exs. AA, AB, AG, AH (intros drafted by Freeman and wire copy on same stories). Freeman testified that although he does not copy these

sources, he often copies key words or phrases. Tr. 329.

## IV. *Editing and Review*

After Freeman finishes his assigned writing for *Nightly News*, he puts the stories into the computer file for the day's run-down, which later becomes the day's scripts. Tr. 39. Freeman marks his copy with a "1." Polster then edits the copy and marks it with a "2." Tr. 40. Sometimes Polster rewrites a story himself, and other times he asks Freeman to rewrite it. *Id.* When Polster makes changes, he may or may not tell Freeman, depending upon the amount of time available. *Id.* Polster generally reviews accuracy, grammar and syntax. Tr. 127. Brokaw then edits the story and marks it with a "3." Tr. 40. Brokaw occasionally asks for a change in emphasis or tone. *Id.* Gould, the senior producer, then edits the story and marks it with a "4." Tr. 40–41. She often talks to Freeman about the story and sometimes makes suggestions. *Id.* Finally, Wheatley, the executive producer, looks at the story and marks it with an "X" if he is satisfied that the story is suitable for the evening broadcast. Tr. 41. The story next goes to production assistants and copies are distributed to the anchor, director, and all who are involved in the show's production. Tr. 41–42. The anchor often makes additional changes on the air. Tr. 42.

Freeman testified that "[i]n television we cannot be ourselves. We're not allowed to individualize. We follow a style and a format established for us by our supervisors and

37. To illustrate this point, Freeman noted the difference between his draft of an intro for a story on illegal surveillance by the FBI, and the version written and read by Brokaw on the air. Freeman Ex. 5 (Freeman draft and copy as read by Brokaw). Freeman testified that he has never written copy "even resembling" Brokaw's version, which Freeman found to contain "many value judgments," such as the phrase "outrageous and fundamental abuses of American liberties." Tr. 51; Freeman Ex. 5. Freeman stated, "I, as a reporter of news * * * don't see that as my place to make such judgments. But Mr. Brokaw, of course, is a commentator and besides, he's the boss." Tr. 51. Wheatley testified, however, that he does not consider the intro written by Brokaw to be "editorializing." Wheatley found Brokaw's writing to be more "compelling" and "evocative" that Freeman's

draft, but he "would have welcomed it from Mr. Freeman." Tr. 966–68 (Wheatley).

38. Freeman testified as follows:

When I was a reporter way back in Alabama and I went out into the field and I covered something, I was not rewriting anything, I was observing, I was taking notes and I was putting the story together based on observation and experience.

When I sit in the Nightly News newsroom and gather in * * * wire copy, I am taking the writing work that somebody else has done and rewriting it.

Tr. 2793. Freeman pointed out, for example, that his draft of a story on a Supreme Court decision and the wire copy are virtually indistinguishable. Tr. 2794–95; NBC Ex. AL.

superiors \* \* \* and we write to their standards and their styles." Tr. 291. Freeman pointed out that the writing style on *Nightly News* is so uniform that a reviewer or editor frequently cannot tell whether Freeman or Deitch wrote a particular story. Tr. 40; *see* Tr. 97. Freeman testified that his writing "is subjected to a great deal of intensive editing as compared to other media \* \* \*." Tr. 42; *see e.g.*, Freeman Exs. 3, 4, 5 (scripts as written by Freeman and as read by Brokaw); NBC Ex. Z (draft intro by Freeman), Ex. I (intro to same story as read by Brokaw), Ex. AB (other intros as drafted by Freeman and as read by Brokaw). "Nothing that I write for NBC is ever put on the air without the approval of at least one other person with authority to change it." Tr. 53. Although Freeman writes "[w]ith the expectation that it will go through these four other people and be approved and probably amended," he does not write with the intent that someone is going to have to edit his copy. He tries to write as well as he can. Tr. 231.

### Bernard Brown

#### I. *Background and General Job Description*

Before joining NBC, Bernard Brown's primary journalism experience was as a writer, general assignment reporter and editor in the New York office of the Associated Press. Tr. 352, *see* Tr. 598–607. Brown joined the Associated Press directly after receiving his bachelor's and master's degrees in English from the University of Michigan.[39] Tr. 352, 598. In 1966, after more than fifteen years at the Associated Press, Brown was hired as a vacation relief writer for WNBC radio; shortly thereafter he joined NBC's local television station as an assignment editor. Tr. 352–53, 607–612.

When Brown joined NBC there was no licensing requirement, and he had no training or experience in radio or television news; nor had he ever taken a course in journalism. Tr. 352–53. He was not given any kind of test or even asked to show a sample of his writing. Tr. 353. Brown has never seen a

job description for his position and, to his knowledge, has never been formally evaluated. Tr. 454.

In February 1973, Brown became an overnight television newswriter for the *Today* show. Tr. 354, 625–26. After several months, he was made a news editor and given responsibility for coordinating the program's news coverage. Tr. 354–55. Although he eventually acquired the title of news producer, his function as the show's news gatherer remained unchanged. Tr. 355, 370.

Brown left the *Today* show in September 1983 to become the domestic producer of NBC *Weekend Nightly News*. Tr. 355, 374. As domestic producer, Brown's main functions were suggesting story ideas, coordinating coverage through communications with correspondents and "routine editing" of correspondents' scripts. Tr. 407–10, 536. For four or five months during the six-year period that Brown held the title of domestic producer, he served simultaneously as domestic and foreign producer. Tr. 431–32, 534. In addition, from May 1989 through December 1989, Brown served as acting senior producer. Tr. 436–39. In January 1990, the new executive producer of *Weekend Nightly News* eliminated the titles of domestic and foreign producer; Brown remained a producer, but was given different duties. Tr. 438; *see infra* pp. 1134–35.

Apart from editing scripts, Brown has done virtually no writing "for air" since he joined NBC. Tr. 365, 407. Although Brown is listed as a producer on "a very long, long, long list of credits," he receives no byline on the work he does, so nothing seen on the air can be ascribed to him individually. He has never been the recipient of any awards or prizes in journalism, and he is not aware of having ever been nominated. Tr. 453.

#### II. *News Producer on the Today Show*

As the news producer for NBC's *Today* show, Brown worked from 2:00 p.m. until at least 1:00 a.m., coordinating news coverage

---

**39.** While in Ann Arbor, Brown worked as a "stringer" or part time correspondent for the *Detroit Free Press, Detroit Times*, the *Detroit* *News,* and United Press International News Service. Tr. 352–53.

for the *Today* show, which aired between the hours of 7:00 a.m. and 9:00 a.m. the following day. Tr. 355. At that time, there were two "news holes" or "mini news programs" within each hour of the two-hour program, each lasting eight minutes on the hour and three minutes on the half hour. *Id.* Brown was responsible for gathering enough news coverage to fill these holes. *Id.* To perform this function, Brown would confer and coordinate with the network assignment desk, correspondents, field producers, and bureau chiefs. Tr. 355–56. Brown analogized his position to that of "a waiter in a French restaurant who wheels up a cart of cheese or desserts. * * * My major job was to make sure he [the morning *Today* producer] had enough to select from." Tr. 358. Brown acknowledged that he used "news judgment," and "all the abilities I had developed over the years," to decide what to place on the cart. *Id.*

At 3:15 p.m. each day, Brown generally attended a conference call directed by the person in charge of the network assignment desk, in which representatives from various bureaus around the country participated. Tr. 359. Brown would listen to everything that was either being offered or already scheduled for the *Nightly News* that evening. Brown would then telephone various bureaus and discuss stories he thought could be carried forward with a "second day approach" on the *Today* show. Tr. 359–60. Once he decided which stories should be offered to the morning *Today* staff, he spoke with correspondents to find out what they could do to "advance" or vary these stories. Tr. 359–60. While waiting for the stories to be transmitted to the news room at 11:00 p.m.,[40] Brown read wire service copy and worked with feature writers for the *Today* show, known as "show side writers." Tr. 361.

One of Brown's most significant duties was writing an "overnight note," in which he attempted to convey to the overnight staff "all

that had happened since they had left the office * * * that morning." Tr. 362. The "real meat" of the note was a list of headlines, followed by a description of what NBC news had done to cover these stories and whether a package from a correspondent on the story was expected. Tr. 363. Brown generally went home after writing this note and answering any questions from the overnight news producer, who came in at 1:00 a.m. Tr. 364.

Brown was also responsible for reading and editing correspondents' scripts, a function unrelated to the selection of stories that would actually air on the *Today* show. Tr. 357–58.

### III. *Domestic Producer on Weekend Nightly News*

After requesting a transfer to a daytime position, Brown was reassigned in September 1983 to *Weekend Nightly News* as domestic producer, where he worked Wednesday through Sunday. Tr. 374. On Saturday and Sunday, when the show was on the air, the staff worked in the *Nightly News* news room, the same news room used by Tom Brokaw and his staff; on Wednesday through Friday, Brown and the rest of the *Weekend Nightly News* staff worked in other offices. Tr. 375. When Brown joined *Weekend Nightly News,* William Chesleigh [41] was the executive producer, Dennis Sullivan was the senior producer, and Don Morfoot was the foreign producer. Tr. 380, 480–82, 558. Apart from the different emphasis in subject matter, the job of domestic producer was essentially the same as that of foreign producer. Tr. 477–78, 559. The primary duties in both positions were proposing stories, coordinating coverage and editing correspondents' scripts for the weekend show. Tr. 536. TV script described at 409.

Brown's main function on Wednesday through Friday was to keep himself informed. Tr. 381. He read the wires, news-

---

**40.** Stories for the morning program were "fed" into New York between 11:00 and 11:30 the night before. During these hours, the network was "dark" and Brown was able to use telephone lines to facilitate the transmission of programming for the next morning at no cost to the *Today* show. Stories could also be fed after 2:00

a.m. when the network became dark for the night. Tr. 356–57.

**41.** Chesleigh left NBC when management decided not to renew his contract. Tr. 2154–55, 2178 (Chesleigh).

papers and magazines, watched shows and suggested feature stories that could be covered for use on the weekend.[42] Tr. 378–79. Brown testified that all his ideas for stories were based on what he read. *See* Tr. 1133–34. Brown noted that the weekend show was more informal than *Nightly News;* rather than attend daily meetings or conference calls, members of the weekend staff "visit[ed] back and forth with story ideas." Tr. 379–80. Brown was also responsible for reviewing and editing proposed scripts for features that came in during the week, generally well in advance of when they would be aired. Tr. 413. The review and edit process for features was essentially the same as that for hard news, and is described in detail below. Tr. 416–17; *see infra* pp. 1132–34.

On weekends, when the show was actually on the air, Brown started the day as he did on weekday mornings, by "reading in." Tr. 382, 393. When Brown arrived at work on Saturdays and Sundays at 8:00 a.m., a document called the "daily outlook" was normally on his desk, which listed the people on duty and the reporting assignments already made, and the status of correspondents who had been dispatched to various places and their whereabouts. Tr. 383–84; Brown Ex. 2 (daily outlook for December 17, 1989). Brown reviewed this document as well as the assignment desk log and the "affiliates list," from which he learned whether any significant stories were being covered by NBC affiliates. Tr. 388, 394; Brown Ex. 4 (affiliates list). Brown also received and reviewed "Sunday," a list of satellites that had been ordered, which was prepared by the foreign producer. Tr. 389–91; Brown Ex. 5 ("Sunday" for January 14, 1990).

Brown testified that he generally knew in the morning which major stories were being covered for the evening broadcast. Tr. 485. Brown testified that as domestic producer he was not involved in discussions regarding which major stories would be covered. Tr. 485–86. He also testified that he did not have authority to ask a correspondent to cover a particular story and could not order satellites without the prior approval of the executive producer. Tr. 427–28; *see also* Tr. 2159–60, 2174–75 (Chesleigh). At the same time, however, Brown acknowledged that he played an active role in suggesting stories to the executive producer, expressing his own point of view, and even arguing with Chesleigh when they disagreed. Tr. 489–90, 546, 549; *see also* 627–28, 632–33 (Brown), 2207–09 (Chesleigh). Nonetheless, Brown repeatedly emphasized that he never made the final decision on whether or not to use a story, since only the executive producer had this power. *See, e.g.,* Tr. 423–24.

Brown's primary responsibility as domestic producer was to work with domestic correspondents assigned to cover hard news stories in the field. Tr. 382. Brown was responsible for coordinating coverage by relaying the executive producer's directions and decisions and providing guidance to correspondents and editing correspondents' scripts. Tr. 426; see also Tr. 511–13, 1136–37; 2159, 2183 (Chesleigh). Brown acknowledged that he occasionally explained the story to be covered to a correspondent, offered his own opinions, provided an "angle," lobbied for additional time for a particular story, or suggested possible cuts, as well as simply relaying instructions from the executive producer.[43] *See, e.g.,* Tr. 487, 488, 511–12, 560–

---

**42.** Brown described two types of stories, "the hard news and the feature," noting that he mostly dealt with "hard news" stories that occurred the day of a broadcast. Tr. 411–12. The feature is a story covering something that does not necessarily happen on the day of air. Tr. 411. Brown testified that "[o]ne of our problems on the weekend is there frequently is not enough hard news. There were not enough events, breaking stories, that occur on the weekend, particularly in the domestic arena, to fill the program." Tr. 379. He added that "in order to fill the program, we must have * * * preshot, preedited features sitting on our film shelf or tape shelf

ready to put on the air to fill the 22 minutes of air time." *Id.*

**43.** Brown testified that in his view there is a good deal more "interference" by producers with work of correspondents on *Nightly News,* and that although he had the same authority, he did not "intrude" as frequently as producers on *Nightly News.* Tr. 514–16. Brown testified that he rarely initiated calls to correspondents, but usually waited for them to call or send in their scripts. Tr. 393. He "vaguely remembers" Sullivan telling him, on more than one occasion, that he (Brown) ought to be initiating calls rather than waiting to hear from correspondents. Tr.

61. Brown further acknowledged that "more often than not" correspondents accepted his suggestions.[44] Tr. 550–51. Brown described his activity in coordinating domestic coverage as "basically routine editorial functions."[45] Tr. 426. He observed, "[i]t's a complicated process * * * to put out a news show; and unfortunately, a great deal of time and effort has to be expended on the routine." Tr. 426; see also Tr. 544 (significant portion of Brown's time spent obtaining and passing on information by telephone). Brown acknowledged that although his activities were directed by and subject to the approval of the executive producer, his work was not closely supervised and he had considerable independence in dealing with correspondents.[46] Tr. 473–75.

Once a domestic correspondent had written a script, the correspondent would submit it to New York for approval. Tr. 408, 498–99. Brown would "read and edit these scripts for grammar, for accuracy [and] for understanding," to ensure that nothing was "confusing or unclear." Tr. 408–09, 493–94. He also made sure that the script conformed to the facts as reported by the wire services. Tr. 417. Brown testified that this script editing function was comparable to that performed by Polster on *Nightly News*. Tr. 516–17. Brown further testified that editing correspondents' scripts was essentially the same work he had done at the Associated Press. Tr. 368, 421.

Brown testified that in editing a correspondent's script, he did not attempt to make the writing more vivid, colorful or dramatic, and that he was not particularly concerned with the relationship of the text to the pictures. Tr. 495–96, 506–09. Nor did he concern himself with "style." Tr. 493–94. He did, however, attempt to "weed out" editorializing and "analytic" or "interpretive" writing, which in his view improperly reflected the opinion of the writer. Tr. 496–99.

Correspondents' scripts were generally reviewed and edited by both Brown and the senior producer, and, on occasion, by the executive producer. Tr. 419. Brown's approval was usually required and he was normally responsible for communicating approval or required changes to the correspondents. Tr. 499 (Brown), 2175, 2185 (Chesleigh). Once a script was approved, the correspondent physically edited the videotape to conform to the approved script, and the finished piece was fed to New York as a "package," which was typically viewed by the entire *Weekend Nightly News* staff.[47] Tr. 414–15, 503, 509. As the domestic producer, Brown had principal responsibility for watching this feed to ensure that there were no technical problems, and was actively involved in deciding whether a story was ready to be broadcast or needed more work.[48] Tr. 415–16, 509–10. Brown's opinion was "specifically solicited" and he was "expected to participate." Tr. 415–16 (Brown); see 2222–23 (Chesleigh). At the same time, however,

550 (Brown). Chesleigh told Brown on several occasions that he should take more initiative in dealing with correspondents, but also testified that Brown did a "fine" job and "seemed to be going after the stories * * * he ought to be going after." Tr. 2158, 2209–10 (Chesleigh).

44. Like the producers on *Nightly News*, Brown was also a source of information and suggestions to the newswriters on *Weekend Nightly News*. Tr. 513–14.

45. This view was corroborated by Chesleigh, who testified that the only kind of judgments Brown was called upon to make as a domestic producer were "news judgments" or "routine editorial judgments." Tr. 2175–76.

46. In preparation for trial, Brown kept daily, almost minute-by-minute, activity logs for January 13 and 27, 1990. Brown Exs. 6 and 7.

Based upon the logs, Brown testified in detail regarding his participation on January 27, in the development of a story on the crash of an Avianca jetliner on its approach to Kennedy airport. See Tr. 397–98, 491–93, 575–91, 640–55, 673–82. This testimony demonstrated quite graphically how Brown, as a broadcast producer, contributed to the shaping of a story.

47. On extremely late-breaking stories, correspondents sometimes edited and fed the package to New York without submitting the script in advance. See Tr. 499–502.

48. Correspondents sometimes suggested "supers," which are printed words to be superimposed over the videotape on the screen. Tr. 428. Brown, like other producers, was responsible for "proofreading" or checking the accuracy of a list of "supers" prepared by a production assistant. See Tr. 428–31, 638–39; Brown Ex. 8.

"[t]he decision rested in the hands of one man," the executive producer.[49] Tr. 415–16.

## IV. Other Positions on Weekend Nightly News

### A. Foreign Producer

For four or five months of his first year on *Weekend Nightly News*, Brown simultaneously held the positions of foreign and domestic producer. Tr. 431–32 (Brown); 2160 (Chesleigh). Although Chesleigh thought Brown did a fine job, and even preferred the role of foreign producer, Brown felt that the arrangement "really didn't work out well" and eventually asked to be allowed to resume his original position as domestic producer. Tr. 432, 534–35 (Brown); 2160 (Chesleigh).

### B. Senior Producer

From time to time, Brown was asked to act as senior producer in Sullivan's absence. Tr. 435–36. In addition, when Chesleigh left the program in May 1989, and Sullivan became executive producer, Brown acted as senior producer until the end of 1989. Tr. 436–38. While acting as senior producer, Brown continued to perform most of his functions as domestic producer. Tr. 432. His additional responsibilities included coordinating with a producer in Washington on political stories,[50] editing scripts to be read by the anchor, editing news digests, and acting as the "air" producer in the control room during the broadcast "to assure" that the show goes as planned, and that "we do not have too much show for the allotted time."[51] Tr. 432–34, 518–19. Brown had the authority to make timing changes, but only the executive producer could "kill" a story if the show was running long. Tr. 424, 564–66; *see also* 434–35. While in the control room,

Brown also continued to watch the wires for urgents and bulletins.[52] Tr. 555–56.

As senior producer, Brown was second in the chain of command with regard to editing show scripts, which he passed on to the executive producer for final approval. Tr. 433. Brown also edited the news digests that aired at 9:00 p.m. and 10:00 p.m., which were prepared by writers and subsequently reviewed only by the anchor. Tr. 552–53.

### C. Broadcast Producer

In January 1990, shortly before trial, Sullivan was replaced as executive producer by John Terenzio. Tr. 438. Brown was informed that Morfoot (the foreign producer) would replace him as senior producer, that Terenzio was "doing away with the traditional arrangement" of domestic and foreign producers, and that Brown would be advised of his role at a later date. Tr. 438. Brown testified that since January 1990, he has been assigned the task of gathering collegiate basketball scores from the wires. Tr. 439. Brown has also been assigned to write a new feature recapitulating the news of the week in brief headline form. Tr. 439–42; Brown Exs. 9, 10. In connection with this assignment, Terenzio has asked Brown to watch "Visnews" and "Skycom," two syndication services, with "the idea of seeing footage that I might think appropriate for use in this week's recapitulation." Tr. 444. Although Brown has responsibility for suggesting stories for this new program, Terenzio retains control of the selection process, and has also given detailed instructions regarding the format of the program. Tr. 439–42, 447–49; Brown Ex. 11. Brown's scripts are reviewed and may be rewritten by the executive and senior producers and the anchor. Tr. 439–40, 442.

**49.** Brown acknowledged that the executive producer did not always have the opportunity to review a late feed. Tr. 509.

**50.** As domestic producer, Brown did not usually coordinate with the Washington bureau, even though the stories involved were domestic, because Washington news and political news were "the specific province of the senior producer." Tr. 432–33.

**51.** *See infra* p. 1149 (Gould testimony regarding control room). With Brown in the control room were the director, technical director, associate director, production assistant, audio person, unit manager and technical supervisor. Tr. 564.

**52.** Chesleigh testified that Brown did "a fine job in the control room. * * * He was very low key, very cool in doing it." Tr. 2162, *see* 2213–14 (Chesleigh).

In addition to the above tasks, Brown still has responsibility for "reading in," and has been asked to review show scripts, although the scripts continue to go through the normal additional editing process, from anchor to senior producer and finally to executive producer. Tr. 445–46, 449. Brown no longer edits correspondents' scripts unless specifically assigned to do so. Tr. 449. However, Brown continues to have responsibility for editing the copy for the evening news digests; this responsibility is shared with the anchor, but no other producers are involved. Tr. 450.

### Robert Garner

#### I. Background and General Job Description

Robert Garner has worked at four jobs since joining WNBC–TV in 1981. Tr. 732–33. He has spent approximately seventy-five percent of his time as a field producer, a position in which his primary function is covering news stories in the field. Tr. 733–35. He covers approximately 250 news stories each year, most of which are assigned, prepared and broadcast on the same day "on an absolute deadline." Tr. 779, 1187–88. Garner has also held the positions of morning news producer, assistant assignment editor and newswriter. Tr. 733–34, 1221–22.

Garner graduated from college in 1970 with a major in mass communications and a minor in journalism. Tr. 1268. Prior to his employment with NBC, he reported the news for the *Newark Evening News*, the Associated Press and several radio stations in New York City. Tr. 1269–1273. Garner began working for NBC Radio News in 1975 and was transferred to NBC's television news operations in 1977, where he held several positions over the next three years. Tr. 1273, 1274–78. He joined WNBC–TV in February or March 1981 as a newswriter/field producer. Tr. 1278.

Generally, Garner does not receive a by-line. If his name appears in the weekly credits at all, he is identified as a writer because there is no separate category for field producers. Tr. 1245–46. He testified, however, that his name may be mentioned on the air as a reward for good work, *e.g.*, when he has obtained "exclusives" or stories ahead of the competition.[53] Tr. 795, 800. Garner has worked on two extended assignments or "sweeps series," which air during periods in which all of the television stations in a particular market are rated. Tr. 779–80. Garner has won several journalism awards for special investigative reports, including an Emmy award for a series entitled "Chinatown Gangs," which he produced with correspondent John Miller.[54] Tr. 790–94, 1330–32.

#### II. Positions at WNBC–TV

##### A. Field Producer/Newswriter: Daily Assignments

In his position as field producer, Garner goes out into the field to report the news.[55] Garner receives his assignments from the assignment desk which, along with the managing editor, also determines whether Garner works alone, with a camera crew, a courtroom artist or with an on-air correspondent.[56] Tr. 734–37, 1193–94. Garner may report part of a story, to be combined with other elements covered by others, or may cover the whole story himself from start to finish. Tr. 734–36; *see* Tr. 802–06. He covers a broad range of news events, including features, breaking news stories, trials, politics, and other general assignment stories

---

**53.** Garner testified that his name has been mentioned during the intro to a story about a dozen times. Tr. 1247; *see also* Tr. 1334–36, NBC Ex. BN (eight scripts in which Garner is named). He was once interviewed live on air. Tr. 800–01.

**54.** After winning an Emmy, Garner was asked to judge news stories for the Emmy awards. Three of the criteria he used in judging these awards

were content, creativity and execution. Tr. 1332–34, 1357–58; NBC Ex. BM.

**55.** Garner is also occasionally assigned to preliminary research projects. *See* Tr. 775–77, 1191–92; Garner Ex. 3.

**56.** Although Garner can and is expected to make story suggestions, he cannot choose his assign-

that range from simple to complex.[57] Tr. 1256–58. He has covered as many as four stories in a single day. Tr. 1188.

Unlike other field producers at WNBC–TV who cover New York City, Garner is not assigned to a particular on-air reporter or correspondent. Tr. 1293–94. Reporters may, however, request that Garner be assigned to work with them on a particular story. Tr. 1189–90. Because Garner is the only field producer assigned to the assignment desk full time, he covers more stories by himself than other field producers. Tr. 1296–97.

Garner begins a typical day by checking with the assignment desk on his way to work.[58] Tr. 737. He carries a beeper and cellular phone, and has a two-way radio installed in his car. Tr. 737. He contacts the assignment desk via two-way radio when he gets into his car and starts driving to work. Tr. 737. The desk either has an assignment for him at that time or tells him to come into the office to receive his assignment. Tr. 738.

If Garner has not been given an assignment in his car, he goes into the office and reports to the assignment desk in person. Tr. 738. The desk may or may not have a story for him right away. If a story is ready when he calls, but he is asked to come in to the desk, it generally means either that he needs to talk to the producers or that there is too much background material to be relayed over the radio. Tr. 1189. When he does get an assignment by radio, he is told what he is covering, where to go and the timeframe involved;[59] he is also told if he will be covering the story alone, or whether to expect an on-air reporter to join him, and which camera crew, if any, will be covering

the story. Tr. 738–39. According to Garner's supervisor, Harry Ryttenberg, Garner may be told the length and format of the story, and given the names of persons to be interviewed, and may even be told what questions to ask. Tr. 2752, 2769 (Ryttenberg). Garner is usually assigned to stories for which a correspondent is not available or because the assignment desk doesn't feel the story "is worthy of a reporter." *Id.* Ryttenberg further testified that Garner has less freedom than a reporter, who is more of a "free agent." Tr. 2770 (Ryttenberg). "The reporter might suggest to the assignment desk or request from the assignment desk, set ups, additional interviews, whereas a field producer is normally told those things." Tr. 2770–71 (Ryttenberg).

Once Garner arrives at the scene, he is required to call the assignment desk to report what he is seeing, so the assignment desk staff can decide whether to discontinue the story, continue as planned or send more help to obtain the desired coverage. Tr. 740–41. Garner is often asked for his opinion with respect to these issues and with respect to the format of the coverage,[60] and will recommend, or even urge, that a particular approach be taken. Tr. 740–41.

At the scene, Garner generally looks around and tries to hook up with the camera crew, either physically or via walkie-talkie, to learn what they are doing. Tr. 739. He then observes, takes notes and begins speaking with people on the scene to find out what is presently going on and what has already happened. Tr. 739. Based upon this information, Garner determines who should be interviewed on camera, and contacts the cam-

ments. Tr. 736, 1303–04; *see* Tr. 1186; *see also* Tr. 2768–69 (Ryttenberg).

**57.** NBC introduced into evidence and played at trial a number of examples of Garner's work as a field producer. *E.g.,* Tr. 1329–30; NBC Ex. BL (videotape); *see also* NBC Ex. BE (time reports describing Garner's assignments) (summarized in Pl.Br. at 37 n. 3).

**58.** Each morning, the chief assignment editor, the producers of the 5:00 p.m. and 6:00 p.m. newscasts and all management personnel participate in an 8:00 a.m. conference call, followed by a 10:00 a.m. morning meeting, to discuss the

stories to be covered. Garner does not participate in the morning conference call or meeting because he is either on his way to work, already on a story or in the office getting his assignment. Tr. 1193–94.

**59.** Garner is frequently told the amount of time he has to complete the field work on a story, *e.g.,* "I need that crew back in half an hour. Get it done." Tr. 738.

**60.** Possible decisions regarding format include whether to send an on-air reporter to the scene, and whether to go live if it is late in the day. Tr. 741.

era crew to tell them there is an interview pending.[61] Tr. 740. If Garner is working without a correspondent, he chooses the questions and does the interviews himself.[62] Tr. 742–43, 1311–14; *see also* Tr. 2767–68 (Ryttenberg). He also coordinates and directs the camera crew.[63] Tr. 1298, 1349–51; *but see* Tr. 2769 (Ryttenberg). When Garner works with a correspondent, they divide the responsibility for fact-gathering, conducting interviews and directing the camera crew. *See* Tr. 802–06, 1300–02. Although they work as "partners," the correspondent is in charge. Tr. 2738–39 (Miller); 2759 (Ryttenberg).

While in the field, Garner is "in constant contact with the assignment desk," which "beeps" him frequently; Garner must respond according to a code reflecting three levels of urgency, the highest being "drop everything and call instantly." Tr. 741–42, 1233–37; Garner Exs. 13, 14 (cellular phone and home telephone bills); Tr. 2753–58 (Ryttenberg). When he has completed a story, Garner will call the assignment desk for instructions. Tr. 741–42. If there is nothing more to be done in the field, Garner returns to the office, sometimes carrying the videotape shot by the camera crew. Tr. 742.

At the office, Garner gives the assignment desk a brief run-down on what has happened in the field. Tr. 743. Immediately thereafter, Garner speaks to the producers of the 5:00 p.m. and 6:00 p.m. news programs, who generally request a brief run-down of the story and a description of the footage and interviews. Tr. 743–44. Sometimes the producers ask Garner's opinion of the story. Tr. 743. The producers then tell Garner the story's position in the newscast, its format,[64] its length, and which anchor will read the story. Tr. 744, 761, 774.

*Writing* [65] *and Editing Videotape*

After receiving instructions from the producers, Garner goes into the tape editing room where he usually writes and edits the videotape of the story at the same time.[66] Tr. 746, 754. First, he sits down at a computer and opens up the "show routine," a directory of stories listing who is doing what moment by moment. Tr. 747–48. Next, he electronically opens the story he is working on to a "script page," which will already contain the format, time allotted, prescribed graphics, and identification of the anchor.[67] Tr. 747–53, 764–65; Garner Ex. 1 (VOSOT script for June 1, 1989 with attached research materials).

Garner proceeds to write the script with the understanding that there is a particular show format, and that he is expected to fill in all the components of this format. Tr. 753. The producers generally label different portions of the story, such as "intro," "tape" or "tag," and allot a specific amount of time for

61. Garner testified that sometimes his decisions concerning the timing of an interview, particularly where there is only one camera crew at the scene, will entail making a choice about whether to proceed immediately or hold the interview until the action is over. Tr. 740.

62. Garner testified that he has a "standard repertory of questions" for certain stories, such as a fire. Tr. 743.

63. Garner testified, "[w]e are not playing Frederico Fellini out there." Tr. 1349. "I tell them what the story is * * *. I tell them what we are going to be shooting. And if I see something good, I will point it out to them. And, occasionally, I'll even * * * want them to shoot a particular thing in a certain way." Tr. 1298; *see also* Tr. 1349–51. Generally, however, Garner doesn't "always stand next to the camera crew. I like to go off and get the facts while the camera crew is shooting." Tr. 1299; *see also* Tr. 2744–46 (Miller) (Garner does not give specific instructions to cameramen).

64. The possible formats include a tell story (also known as a "copy story" or "reader"), voice-over, voice-over with sound on tape ("VOSOT") or anchor/reporter package. *See* Tr. 745–46, 768–75; Garner Ex. 2 (anchor package). Garner testified that there are times when he is able to change a producer's mind with regard to format based on his view of the coverage he has obtained. Tr. 744–45, 761, 774, 1260–61.

65. In the newswriting aspect of his job as a field producer, Garner performs essentially the same function as Freeman. Tr. 1315.

66. This process is also called "cutting the story." Tr. 757.

67. When writing a script, Garner must take into account the reading capabilities of the assigned anchor. Tr. 745–46.

each.[68] Tr. 761. The producers are flexible on the length of a particular segment as long as the whole story fits within the time allotted for the entire piece. Tr. 761–62; *see* 1261–62. For example, where there is an abundance of good tape, Garner may shorten the intro. Tr. 761.

As Garner is writing, the tape editor is editing the tape with Garner's guidance.[69] Tr. 755–76. Generally, Garner writes the first sentence and reads it aloud at the estimated reading speed of the assigned anchor. *Id.* He then tells the editor he needs a certain number of seconds of tape of a particular scene. Tr. *Id.* The process of writing and editing is accomplished relatively quickly and, according to Garner, is "much more cut and dried" than suggested by "college text books."[70] Tr. 763. If Garner has worked with the camera crew, he doesn't bother to look at the tape himself, and usually lets the tape editor pick the portion of the tape to go with the written script.[71] *See* Tr. 754. Garner is also responsible for ordering "supers."[72] Tr. 757. Garner estimated that he spends between a half hour and two hours in the editing room on an average day. Tr. 746–47, 1353. The bulk of his day is spent gathering the news. Tr. 746.

Once he has finished writing, Garner puts an asterisk on the script, indicating to news room staff that he has completed the story. Tr. 758. The associate producer then looks at the script closely and is responsible for any heavy copy editing. Tr. 758–59. The producer then looks at the script to see if she or he generally likes the story. Tr. 759. In addition, the assistant news director (Paula Walker) looks at every script before it gets on the air. Tr. 759. The executive producer (Clare Friedland) reviews the tape on most stories and may look at the script as well.[73] Tr. 759; *see* Tr. 1323–25. Unless there is something unusual that might need special attention,[74] Garner has at this point finished his work on the story. Tr. 759.

Garner testified that his writing style is "anonymous," and that his work has been attributed to others. Tr. 1247–48. He further testified that there is a formula for the news stories he produces, and that what he writes is dictated by the graphic, the tape, the time allotted and the producers involved. Tr. 1259. Garner acknowledged, however that he is not told how to weave together all of the elements of the a package (Tr. 1262), that he selects what to report from extensive raw material (*see* Tr. 1305–11), that he uses visual images and "valuative words" in his writing (Tr. 1315–16, 1320), and that there "may be an occasional flash" of creativity in his work. Tr. 1316. Garner also testified that he has "strong opinions about what [his] story should be," that he makes recommendations and sometimes argues with the producers in support of his positions, and that his arguments sometimes result in change. Tr. 1260–61.

B. *Field Producer/Newswriter: Investigations and "Sweeps"*

Although the vast majority of Garner's assignments as a field producer are completed in one day, he is from time to time assigned to long-term investigative reports

68. Miller testified that "[t]here are days when my writing is formula * * * as necessitated by time constraints and then there are days when my writing is very much my own." Tr. 2747 (Miller). Miller considers Garner a "good writer." Tr. 2749 (Miller).

69. Garner is not required to be in the editing room while the tape is actually being cut. "As long as I retain editorial control and as long as I outline the specific sound bites that I want, I can give the editor a general description of the coverage, as long as the track is laid down or I give the amount of time that the cover footage needs to be in, the editor can choose himself." Tr. 1189; *see also* Tr. 1323–24.

70. Garner explained this process in detail. Tr. 763–64; *see also* Tr. 1248–49. Miller testified that his work in the tape room is only rarely creative. Tr. 2746–47.

71. Garner testified that he is "not that concerned with finding the finest scene available." Tr. 754.

72. *See supra* note 48.

73. The anchor is also free to make changes in Garner's script, either in writing or by ad-libbing on the air. Tr. 767–68.

74. For example, if he runs out of tape on a particular story, Garner must advise the control room director that there is no "pad" at the end of the tape. Tr. 759–60.

or "sweeps series," which are multi-part features aired during periods in which all of the television stations in a particular market are rated. Tr. 779–80.

Garner has co-produced two sweeps series, both of which have won awards. Tr. 780–81, 790–92, 1330–32. In 1985 Garner and correspondent Mike Taibbi produced a sweeps series on investigation of Baptist Hospital called "Surviving a Stay in the Hospital." Tr. 780–81, 786. Garner subsequently collaborated with correspondent John Miller on an investigative report entitled "Chinatown Gangs." Tr. 791–94. Garner pointed out that when he is working with a correspondent on an investigation or sweep series, the correspondent decides how the work will be divided, and has ultimate decision-making authority. Tr. 786, 1300; *see also* Tr. 2737–43 (Miller). The field producer "assists" the correspondent. Tr. 786. Garner testified that it was actually Mike Taibbi who wrote the script for "Surviving a Stay in the Hospital." Garner acknowledged, however, that they shared the reporting, and that Garner had provided raw information that found its way into the piece. Tr. 786, 1356. Garner also discussed the organization of the series with Taibbi and reviewed and commented on the script. Tr. 791, 1360.

Garner testified that he is closely supervised by management, even when he is working on long-term investigations. Tr. 781, 790, 800; *see* Tr. 784–85; Garner Ex. 5. He must obtain supervisory approval to spend any considerable amount of time on a long-term investigation, and must be released from daily coverage by the assignment desk to leave the building to meet with a source on an investigative report. Tr. 1187.

Garner acknowledges that some of his investigative reporting has had an impact on the community and resulted in proposed legislative changes. Tr. 1279–81.

### C. *Morning News Producer*

Garner has spent a portion of his time at WNBC–TV producing morning news programs. Tr. 733, 1196. These newscasts be-

gan as "cut-ins," which are "holes" left in the *Today* show to be filled by local stations, at 6:55 a.m., 7:25 a.m. and 8:25 a.m., and which in 1982–83 ran three minutes and sixteen seconds each. Tr. 733, 1196–97. The 6:55 a.m. cut-in subsequently evolved into a fifteen-minute newscast called *News 4, Morning Edition,* starting at 6:45 a.m., and later became a thirty-minute newscast. Tr. 1197. Garner worked as a writer and producer of the three-minute morning cut-ins for approximately twelve to eighteen months before leaving the position in the early spring of 1983. Tr. 1198. Garner has also acted as a temporary or substitute producer for the fifteen and thirty-minute newscasts. Tr. 1198–99. Garner produced cut-ins in addition to performing his regular field producing duties for over a year. Tr. 1198. During this period, he came to work at 4:00 a.m. each morning to complete the cut-ins for the *Today* program. Tr. 1198. A night assignment editor, on duty throughout the night, prepared a list of the "spec tape" [75] that had come in overnight. Tr. 1199. This editor would also give Garner an oral briefing on the major developments of the evening. Tr. 1200. Since the morning newscast had no independent production facilities or field staff, Garner's choice of coverage was limited and he frequently revised stories from the previous evening's 6:00 p.m. and 11:00 p.m. newscasts. Tr. 1202, 1338–39. The format of the morning cut-ins was virtually identical each day, but within that format, Garner decided which existing stories would be aired. Tr. 1203; *see also* Tr. 1201–1208.

As producer of the morning shows, Garner was responsible for everything necessary to get the news on the air. He testified that "[t]he producer's job on that morning show is * * * writer, producer [and] tape cutter." Tr. 1217. After finishing the cut-ins at 8:30 a.m., Garner frequently continued the day as a field producer; on occasion, he also remained in the office working as a newswriter. Tr. 1198. Since the spring of 1983, Garner has worked almost exclusively as a field producer, and acts as the morning producer only

---

**75.** Spec tapes are tapes prepared on speculation by "independent outfits who roam around the streets at night" when NBC does not have camera crews out. Tr. 1200. NBC's management places strict limits on the purposes for which spec tape can be used. *See* Tr. 1200, 1230.

when the regular staff is out sick or on vacation. Tr. 733, 1199.

## D. *Assignment Editor*

While working as a field producer, Garner has occasionally filled in on the assignment desk as an assistant assignment editor. In that position, Garner assists the assignment editors in covering the news by gathering and relaying information and instructions to reporters in the field. Tr. 1221–22.

In November 1989, Garner became the night weekend assignment editor.[76] Tr. 1222, 1336. On the weekends, Garner arrives at work at 3:00 p.m. for an hour overlap with the day assignment editor who leaves at 4:00 in the afternoon. Tr. 1223. Garner arrives after the camera crews and reporters have all been assigned to their stories for the 6:00 p.m. newscast. Tr. 1223. Unless there is breaking news, only one camera crew and a night reporter are left to cover a story for the 11:00 p.m. newscast. Garner therefore consults with the producer who chooses the story that this one crew will cover. Tr. 1223–24; *see* Tr. 1337. During the week, he is either a member of a writer's pool or an assignment editor, as needed on a daily basis. Tr. 1225.

### *Testimony of NBC Witnesses*

The testimony by NBC's witnesses with respect to plaintiffs' daily schedules and job functions, and their testimony regarding the role of a newswriter or producer in putting together a newscast, was to a large extent consistent with that presented by plaintiffs, and will not be repeated here. Generally, however, the NBC witnesses strongly disagreed with plaintiffs' testimony regarding the extent to which their work is "creative," "analytic," or "interpretive," or the product of "imagination, invention or talent," and the extent to which their work requires the exercise of discretion and independent judgment.

### I. *General Testimony Concerning NBC and the Broadcasting Industry*

Wheatley, the executive producer of *Nightly News*, testified that growing competition, from the other two major American networks, the cable news network, local stations and entertainment programs, "clearly necessitates" that NBC present "the most interesting and dynamic programs that we can," and that writers and producers must be increasingly inventive in the ways they go about gathering and presenting their stories. Tr. 860–61 (Wheatley); *see also* Tr. 1484 (Gould). The broadcast journalist must also take into consideration the degree of disruption that exists in most American homes in the evening when the news is aired. Tr. 984 (Wheatley); 1484 (Gould). WNBC assistant news director Paula Walker added that "we want the viewers to rely on us for a number of reasons, for journalism, for good television, for good story telling, for entertainment. All of those things are included in a newscast." Tr. 2556 (Walker). As a result of the current environment, NBC management insists that its broadcast journalists make their product engaging enough both to attract viewers and to ensure that they are maintained.[77] Tr. 1400 (Friedland).

According to Wheatley, NBC strives for "clear, creative writing" to differentiate its programs from those of the competition, and tries to present stories in "the most interesting, insightful, creative way." Tr. 861–62 (Wheatley). Wheatley defined "creativity" as "the process by which one takes information, perhaps a list of facts, perhaps some judgments made by people in the news and organizes them into an item or a story that * * * communicates the information." Tr. 902–03 (Wheatley). According to Wheatley, "all news writing is creative." Tr. 979 (Wheatley). Wheatley testified that the show producers and newswriters make numerous decisions in connection with individu-

76. Garner was placed in this position "until further notice" as a form of discipline because the managing editor did not like his behavior toward the night weekend assignment editor. Tr. 1222. Officially, Garner retained the title of field producer, and was on "temporary assignment" as an assignment editor. Tr. 1345.

77. Competition for viewers is intense because of their role in the determination of advertising revenues. Tr. 1399 (Friedland).

al stories that do not require the approval of management; the majority of these decisions, however, are "routine" news judgments. Tr. 912–13 (Wheatley).

William Moll, vice president and general manager of WNBC, testified that WNBC's strategy for success in today's competitive atmosphere involves an effort to "stand out" and be as differentiated as possible.[78] Tr. 1581 (Moll). NBC's expert witness, Reuven Frank, testified that good writing "distinguishes one program from another." Tr. 1015 (Frank). Frank testified, for example, that "CBS field reports are better written than NBC or ABC field reports." Tr. 1086, 1109 (Frank).

NBC's experts also testified that recent technological innovations add greatly to the demands placed on broadcast journalists.[79] New technology provides "the ability to cover things closer to deadline and to spread out more and get more angles to the story in the same amount of time." Tr. 2660 (Yoakam). Broadcast journalists have become responsible for a greater number of decisions due to the expanded alternatives and increased amount of material that must be considered, evaluated and then edited into the final product.[80] Tr. 2134–35 (Hoyt). Given these heightened demands, it is no longer true that the majority of journalists have acquired

their skills by experience rather than by formalized special training. Tr. 2332 (Hoyt). Professor Hoyt testified that today, a degree in broadcast journalism is "almost essential" for entry to the field.[81] Tr. 2124 (Hoyt).

Additional demands on NBC's journalists stem from the crucial importance of maintaining the credibility that NBC's anchors, particularly Tom Brokaw, have with the public. Wheatley testified that "Tom Brokaw is the very image of NBC News; and his credibility is important not only to our program, but to the entire NBC organization." Tr. 862 (Wheatley). According to research done over the years, the public's perception of Brokaw's credibility is very high. *Id.* To preserve its image, WNBC relies on its staff of writers and producers to put together a "credible creative product that the anchor can put his or her face and voice on." Tr. 2561 (Walker).

Today's competitive television market demands high standards, particularly in New York, which is the number one market based on the number of television households available to watch programming. Tr. 1570, 1586 (Moll). With more than 7.2 million homes, the New York market is "thick * * * with television viewing opportunities." Tr. 1573–74 (Moll). In addition, with all the networks

---

**78.** Notably, however, Moll testified that WNBC has changed the format of *Live At Five* from "a little softer show" with "many live interviews and more feature material" to a "little harder newscast" to be more like the hard newscasts competing with it on the other networks. Tr. 1577–78, 1595 (Moll).

**79.** Professor Yoakam testified regarding major technological changes in the presentation of television news which evolved somewhere in the middle of the 1970's. This technology, called electronic news gathering (ENG), includes minicams, portable videotape equipment, editing systems involving computers, sophisticated graphics technology and portable microwave equipment for sending signals from the field back to the station. Tr. 2481 (Yoakam). In addition, satellite news gathering (SNG) evolved in the 1980's. These developments permit great flexibility in terms of going out into the field and getting high quality words and pictures back to the station extremely rapidly. Tr. 2482–83 (Yoakam). According to Professor Yoakam, the benefits of recent technology have been very pronounced and "have changed the face of television news." Tr. 2484–85 (Yoakam). Yoakam acknowledged, however, that the principles of good newswriting

have not changed significantly since the days of film. Tr. 2671–72, 2675 (Yoakam).

**80.** Garner testified that changes in technology have reduced the amount of decisionmaking, (Tr. 2773), and that because he is no longer required to carry film from the field to the studio, where the story is written and cut, he is "more of a leg man under the new technology than [he] ever was under the film technology." Tr. 2775 (Garner).

**81.** Hoyt testified that although an academic course of study is not required to enter the field, the most recent survey he had seen indicated that everyone hired in 1989 to fill entry level positions in broadcast news had earned a college degree. Approximately two-thirds of these recent hires had a degree in broadcast journalism and another twenty percent had studied journalism and mass communication generally. Tr. 2320 (Hoyt). Today, there are 365 journalism programs, with 206 offering majors in broadcast news. Tr. 2124 (Hoyt). Hoyt estimates that there were only thirty-five to forty programs in the 1940's. *Id.*

headquartered in New York, it is the "mecca of broadcasting" and attracts "the best and the brightest" of those who want to work in the industry.[82] Tr. 1574 (Moll). The plaintiffs therefore hold coveted jobs at the "pinnacle of broadcast news." Tr. 896 (Wheatley); *see also* Tr. 2536 (Yoakam). NBC's witnesses acknowledged, however, that all news media in New York, including print journalism, are highly competitive. Tr. 1418 (Friedland); 1603 (Moll).

## II. *Testimony Pertaining to Freeman*[83]

NBC presented extensive testimony from Freeman's supervisors and co-workers regarding Freeman's role as the domestic newswriter for *Nightly News*, as well as expert testimony regarding the job of television newswriters in general.

Executive Producer Wheatley defined the responsibilities of *Nightly News* writers as follows:

> to be up-to-date on the various news developments that fall within their areas; and in a number of instances, to keep me informed on that, to share with me their judgments on that; and, finally, and I guess most important, is to write well and creatively and insightfully for the program.

Tr. 863 (Wheatley). Wheatley testified that he expects the writers on his program to "write well, which means that they write copy that is informative and interesting, that is accurate, that has clarity, that whenever possible shows some substantial creativity engaging the interest of the audience." Tr. 888–89 (Wheatley). "[A] reasonable number of years of experience" and "a sense of history" are also important. Tr. 895 (Wheatley). Wheatley acknowledged that accuracy and clarity are "paramount," but testified that talented writers will "find all sorts of different ways to write news stories and still be true to the facts and information." Tr. 893, 902 (Wheatley).

Wheatley noted that there is a special kind of talent involved in writing for broadcast media, as opposed to print media: the television newswriter "has to write for the eye as well as the ear," and "create something of a synergy on the words and pictures to tell the story." Tr. 880, 984 (Wheatley). Gould pointed out that it is essential that the words and pictures complement each other in a "creative" way, and noted that the writer frequently decides which pictures should be used and the sequence of the pictures in the story.[84] Tr. 1469–72, 1479, 1553 (Gould). Wheatley also noted that broadcast news requires "creativity and imagination" in writing "transitions" that will take a viewer "seamlessly" from one story to the next. Tr. 832 (Wheatley); *see also* Tr. 1446, 1522 (Gould).

Frank emphasized that "[h]ow something is written is very much the product of the individual and varies from one person to another rather than with formats." Tr. 1012 (Frank). "Two equally skilled people will do things differently when * * * engaged in the creative process." Tr. 1019 (Frank). When asked if it is possible for a newswriter to be creative, Frank responded that "it's possible; it's necessary; it's fundamental." *Id.* He also disagreed with Freeman's testimony that the format of a program significantly limits the opportunities for creative expression. "They're merely the mechanics of the presentation. The creativity is expressed in the choice of material." Tr. 1121–22 (Frank).

---

**82.** Hoyt testified that working at the level of a network television news writer is "the extreme" in terms of the "creativity, originality [and] expectations" involved. Tr. 2143–44 (Hoyt). He explained that this is because of the complexity of the stories, the number of sources and the time constraints imposed. *Id.* Plaintiffs pointed out, however, that the Indiana University journalism department, where Professor Yoakam teaches, offers no courses in "creative writing," and that the word "creativity" is not used in his book on broadcast journalism. Tr. 2615–17, 2689 (Yoakam); Freeman Ex. 28; NBC Ex. DC. Yoakam also acknowledged that a "talent test" is not required for admission to the Indiana University journalism department as it is for admission to schools of music and art. Tr. 2613, 2617 (Yoakam).

**83.** This section also pertains to Brown and Garner to the extent they function as newswriters.

**84.** Gould testified that when Freeman sometimes failed to pay sufficient attention to the pictures, she admonished him, "Jack, you['ve] got to look at the pictures before you write." Tr. 1471 (Gould).

Frank explained that "[i]n any given factual situation, the number of facts available approaches infinity." Tr. 1030 (Frank). All television copy has to be written based on these numerous facts and hundreds of words of source material. Therefore, television newswriters are left with many choices. Tr. 1107 (Frank); 2487–88 (Yoakam). Of course, "[s]ticking to the facts is vital." Tr. 1065 (Frank). However, holding the viewer's attention is also crucial. If nobody is listening, there can be no communication. "To communicate you must be interesting." *Id.; see also* Tr. 1029, 1085 (Frank); 2498 (Yoakam).

Senior producer Cheryl Gould testified that "at his very best, [Freeman] is a very imaginative and colorful, vivid writer." Tr. 1473 (Gould). She expects Freeman to write creatively, *i.e.,* to find "colorful, vivid language that has good use of adjectives or very active verbs, that finds an interesting twist, an interesting hook * * * an interesting quote that might lead you into a story or an interesting incident." [85] Tr. 1491–92 (Gould). Gould defined imagination in newswriting as "using image," and considers it "an important part of writing." Tr. 1550 (Gould). She acknowledged that these qualities can also be found in *The Wall Street Journal, The New York Times* and *The Washington Post.* Tr. 1538–40, 1543 (Gould).

Wheatley acknowledged that Freeman is not permitted "to write editorials [or] to write in an editorial fashion," and Gould distinguished Freeman's writing from the "commentary" and "opinion" given by John Chancellor. Tr. 905 (Wheatley); 1532 (Gould). Freeman is, however, expected to provide "perspective," and to communicate the significance of a story to the viewers. Tr. 891, 960 (Wheatley). Gould testified that "just about everything [Freeman] writes is in some sense analytical," and that Freeman's function of

boiling data down to its essence is "highly honed analytical work." [86] Tr. 1526, 1530 (Gould). Gould acknowledged that the majority of the stories in *The New York Times* are analytical in the same sense. Tr. 1527, 1534–35 (Gould); *see* Freeman Ex. 17 (front page of *The New York Times* for March 6, 1990). She also acknowledged that stories in *The New York Times* contain context and background, and that it is the function of all news writing to tell what the story is about and what makes it important. Tr. 1535–36, 1541–42 (Gould). Frank testified that Freeman's writing "has an element of analysis," but is not "analytical writing." [87] Tr. 1104 (Frank); *see also* Tr. 905 (Wheatley) (Freeman's writing has more restraints on it than the columns of commentary and editorial writers); 2700–02 (Walker) (a columnist, such as Gabe Pressman, can state his opinion, taking it further than what he can actually prove, whereas newswriters must have "a pretty strong justification" for conclusions they draw).

NBC's witnesses disagreed with Freeman's view that the time constraints on *Nightly News* limit a writers' creativity. *See* Tr. 889–90 (Wheatley); 1530 (Gould). Gould testified that a television writer, who has only twenty-five seconds rather than a column or two columns in a newspaper, must be "much more selective and interpretive, analytical of the data to really come up with what you have boiled it all down to, its essence." Tr. 1530 (Gould). NBC witnesses also disputed Freeman's suggestion that the content of his writing is "dictated" by Brokaw, or determined by the format set by Wheatley. Wheatley pointed out that when Freeman is initially given a writing assignment, he has wide latitude as to what he chooses to write. Tr. 957 (Wheatley). Brokaw's assignments are very brief and to the

---

**85.** Gould found Freeman's choice of the word "crippling" to describe the effect of a Greyhound bus strike to be "good, active use of language" and "a creative use of a word." Tr. 1505–09 (Gould).

**86.** Gould gave the following example:

If you look at data, for example, census data, and if we want to do a story on it, to analyze that data and come up with what you think is the most important news of it, whether it is

that the rate of population is growing twice as fast among blacks as it is among whites, that to me is analytical work. You are analyzing data and coming up with something that is a news story.

Tr. 1526; *see* 1529–30 (Gould).

**87.** Yoakam could not point to any place in his textbook on broadcast journalism that mentions the word "analytical." Tr. 2689 (Yoakam).

point; he typically says something like, "Jack, why don't you do segment 12. Ed, you do segment 3," etc. Tr. 1445 (Gould); *see also* Tr. 882 (Wheatley). Deitch, the foreign writer on *Nightly News*, who has responsibilities and duties essentially identical to those of Freeman,[88] testified that he receives "guidance" and suggestions from Polster, Kusnetz or Chesnutt regarding the elements of the story that might or should be included; he tries to accommodate these suggestions, but is not "compelled" to do so. Tr. 1881–82 (Deitch).

Both Wheatley and Gould testified that Freeman is rarely given any directives on how a particular story should be written; that it is only for a "minority of items" that the executive producer suggests or directs that Freeman take a particular approach or include a certain point—often with considerable debate. Tr. 882–84 (Wheatley); 1445–46 (Gould). Wheatley described his supervision of Freeman as "minimal"; in "most instances, he is free to write as he wishes." Tr. 956–57 (Wheatley).

According to NBC, "[e]very piece of our writer[s'] copy is original. We don't want them to simply transcribe a wire service; otherwise, we could just put the wire service on the air and roll that." Tr. 924 (Wheatley). Wheatley pointed out that there is "pathos and drama" in the news that needs to be communicated. Tr. 890 (Wheatley). "[W]e don't want to do a dull news program; * * * within the bounds of good journalism, we want our program to be interesting and insightful and creative." Tr. 889 (Wheatley). Deitch testified that "there's a lot of room for individualizing a story on a program like ours."[89] Tr. 1892 (Deitch). He stated, "I try to take facts and information in a kind of generic form and bring to those facts and information something of myself whenever possible."[90] *Id.* Deitch testified that "my job is to take the raw materials in the wires and to give a polished, interesting, unique presentation for our broadcast." Tr. 1880–81 (Deitch). He described this process as follows:

> Well, first you have to know all the facts, of course. You have to familiarize yourself with the story. Then you have to make sure you understand the story, or that I understand the story is what I mean to say. I try to do that first.

> Then I ask myself how much do I think the audience knows about the story. Quite often, the audience doesn't know too much of a story; and I think about the background of the story, perspective; and I consider what kind of history or background I'd like to put into the story.

> With that in mind, then I think of the style, what style I'd like to tell the story in. I can tell a story in a very straightforward declarative style with a news, the real news of the story in the first sentence, or I might try—I might decide that it's better to give people a little background first and tell them that something may have happened recently and today another development in connection with that happened. In that sense I'll back into the story. I won't be as direct about telling the story as I might.

> I will also decide what the tone of the story should be. Is there any humor in the story? How do I work it in?

Tr. 1879–80 (Deitch). Deitch further testified that he tries to give prominence to the

---

**88.** The jobs of domestic and foreign writer differ only in the subject matter of the writing. Tr. 1474 (Gould).

**89.** NBC introduced videotapes and scripts of a number of stories prepared by Deitch. *See* Tr. 1896 ff.; NBC Exs. CF–CJ, CN–CV. Notably, these examples of Deitch's work were selected by Deitch, who was asked by NBC's attorneys to select "well-written" and "complex" stories, and were taken from a special tape used by Deitch to keep examples of his work. Tr. 2046–50, 2056 (Deitch). Deitch was unable to recall any story he had written recently that was not rewritten from wire copy, reporters' scripts or other source material. Tr. 2086 (Deitch). Plaintiffs pointed out that Deitch's intro to a story on the Khmer Rouge was drawn directly from the correspondent's script. Tr. 2073–76 (Deitch); *cf.* NBC Ex. CP *with* Freeman Ex. 23; *cf. also* NBC Ex. CH *with* Freeman Ex. 20; NBC Ex. CL *with* Freeman Exs. 21 and 22.

**90.** Deitch acknowledged that he must accommodate the style of the anchor who is reading his writing. Tr. 1893 (Deitch).

"drama or human interest" in a story.[91] Tr. 1880 (Deitch). Deitch believes that "[w]ithin the formats, \* \* \* there's a great deal of leeway and room for individual style." Tr. 1893 (Deitch). He stated that he tries to "find things in the story from my own experience and background that will make the story a unique story for our program." Tr. 1892 (Deitch). Deitch also testified that although he would not call his writing "news analysis per se," it contains "a lot of analysis." Tr. 2000 (Deitch).

NBC's witnesses also disagreed with Freeman's testimony that the *Nightly News* editing process limits his independence or creativity. Wheatley explained the reasons for NBC's extensive review process as follows:

First of all, we try to have high standards and want to make sure that everything that we put on the air is as sharp as it can be. And it seems to me that it's helpful to have some redundancy in terms of the number of people who look at anything, and we find that different people along that small chain may have different—may have information or insights that could be helpful in the final product. So, therefore, we find that it doesn't really hurt any, or we don't think it does anyway, to have a number of key people look at that copy.

In some cases it is subsequently changed to reflect a particular piece of information or to put some insight into the copy. Occasionally, one of us will find an error that by virtue of our own knowledge, you know, it's that sort of process that we find helpful.

Tr. 892–93 (Wheatley). Wheatley acknowledged that Freeman's writing rarely airs without being reviewed by at least one producer (Tr. 922), but testified that this process does not detract from the writer's responsibility "to produce well written, accurate, clear, insightful [and,] whenever possible,

creative copy." [92] Tr. 893 (Wheatley). The editor ensures that the transitions are good, that the story has been given the appropriate context and that the story is written with "vitality." Tr. 1474–75 (Gould). Reviewers may ask the writer to "punch it up," meaning, to make it more interesting, or to add more "suspense" and "drama." Tr. 1475 (Gould). When copy changes are requested, there is usually a "give and take" between the writer and the editor, and a consensus is reached. Tr. 1883–84 (Deitch).

Deitch pointed out that the editing process is different from supervision:

Everybody in this business has his or her copy edited. If somebody were dictating over my shoulder what to write, I would consider that supervision, but no one is doing that. People are reading my copy for facts, for grammar and for approach to a story; but I think that in most cases, in all cases whenever possible, I think that I find that the people reading my copy would like to leave it the way I've written it.

Tr. 1891 (Deitch). Deitch testified that he expects the news editor and producers to make his writing more interesting and exciting, and that he has occasionally been asked to rewrite a story because the editor thought it was too dull. Tr. 1891–92 (Deitch). Wheatley emphasized that notwithstanding the existence of multiple reviews, the majority of the items written go through the process either without change or with only minor revisions, and Gould pointed out that there is not always time to edit Freeman's writing on developments that occur while the show is on the air. Tr. 893–94 (Wheatley); 1461–65 (Gould).

NBC's witnesses challenged Freeman's claim that he "mostly listen[s]" at the morning meeting,[93] and does not play a significant role in the selection of stories or determining the shape of the broadcast. According to

---

91. Deitch added that in writing intros, he tries "to set up the story," and to "prepare the viewer for the story that follows. It may require some facts that aren't in the report. It can go beyond the mere \* \* \* reporting of factual elements. You can also set a mood with a lead-in as well \* \* \* a tone, a feeling." Tr. 1915 (Deitch).

92. Hoyt also testified that the extensive review process does not constrain a writer's discretion or independent judgment, but reflects the importance of each individual word to the overall story. Tr. 2145 (Hoyt).

93. *See* Tr. 149–51 (Freeman).

NBC, Freeman has responsibility for keeping the executive producer informed of various news developments and his (Freeman's) judgments concerning such developments. Tr. 863 (Wheatley); 1714–15 (Chesnutt). Wheatley testified that he relies on the writers for information that is critical in making his decisions as to what goes on the air. Tr. 871, 913–14, 943 (Wheatley). Since no individual "can have a corner on the information and judgment market," it is crucial that there be an active exchange of ideas and information. Tr. 873–74, 877–78 (Wheatley). Writers are therefore expected to provide information, make suggestions and share their judgments and insights throughout the day. Tr. 887–88, 939–40 (Wheatley); 1443–44 (Gould); 1883, 2022–23 (Deitch). Freeman's recommendations are taken very seriously and not just considered "idle talk in the news room." Tr. 1715–16 (Chesnutt). Deitch testified that his "evaluation" of a story carries considerable weight. Tr. 1875–76, 2008–09 (Deitch). "I will say to Mr. Wheatley that I think the story is not worth telling. And he will then invariably say, 'Let's drop it.'" Tr. 2010 (Deitch).

Writers regularly attend and participate in the morning meetings. Tr. 873, 876 (Wheatley); 1441 (Gould); 1876–77 (Deitch). Gould testified that the meeting is "like a family dinner table discussion amongst all the producers [and] writers in the room, where we really do hash out what we think ought to be getting covered that day and how the pieces should look." Tr. 1440 (Gould). All the participants in the meeting, including Freeman, discuss potential stories and offer their opinions regarding "what angles to focus on." Tr. 1877 (Deitch); see also Tr. 1441 (Gould). Both Freeman and Deitch make recommendations regarding the length of a story, participate in the selection of graphics, direct the work of. the tape producers, and give assignments to researchers and production assistants. Tr. 830, 874–75, 909, 974–75 (Wheatley); 1445, 1470–71, 1565 (Gould); 1884–87, 2023–25 (Deitch). Wheatley acknowledged, however, that he makes the final decisions on what graphics will be used on the program and "the critical decisions as to what stories are in the program." Tr. 909, 912 (Wheatley).

During the afternoon run-down meeting, the writers often suggest stories, since they are the ones who are most "familiar" with the wires. Tr. 1444–45 (Gould). The run-down meeting is "a collegial effort" in which "[e]verybody volunteers ideas," and in which the writers freely express their disagreement with the judgment of the executive producer.[94] Tr. 1445 (Gould); see also Tr. 2008 (Deitch). In sum, writers are "full-fledged citizens of [the] editorial process."[95] Tr. 975 (Wheatley).

Both Wheatley and Gould testified that the "national outlook" prepared by Freeman is an essential part of the process by which *Nightly News* is produced.[96] Tr. 878 (Wheatley); 1442–43, 1468 (Gould). In addi-

---

**94.** Although Deitch acknowledged that he is not free to ignore suggestions from the news editor or producers, he feels free to discuss any disagreement with Wheatley. Tr. 2017, 2022 (Deitch). Deitch does not view the news editor or domestic or foreign producers as his "superiors." Tr. 2013 (Deitch). Freeman testified that the core group "operates as collegially as any group where some of the members make ten times as much as some of the others." Tr. 2796–97 (Freeman). In fact, according to information provided to plaintiffs at the end of trial, the highest paid member of the core group made more than five times Freeman's base salary of $895 per week and more than three times his total 1989 earnings of $85,312.90. *See* Defendant's Letter to the Court dated June 8, 1990 (with NBC compensation schedules provided to the court in camera); Gerber's Letter to Garner dated May 24, 1990 (with proposed Stipulation and Order relating to plaintiff's compensation).

**95.** NBC acknowledged that no employee reports to a newswriter, and that newswriters have no responsibility for hiring, firing or evaluating newsroom employees. Tr. 931 (Wheatley); 1565 (Gould); *see* Freeman Ex. 15 (organizational chart). Freeman also pointed out that the core group is not "interchangeable," and that only management producers substitute for the executive or senior producer. Tr. 2788–90.

**96.** Gould testified that she was particularly impressed by Mr. Freeman's story list because "he's got a real good eye and ear for a news story * * * he's got a good sense of humor, [he] finds ironic stories and bizarre twists of things that appeal to my bizarre sense of humor." Tr. 1469 (Gould).

tion, according to Wheatley, the lists of suggested stories that are compiled daily constitute "opinions as to what is newsworthy and what we might want to include in the program" and therefore play a significant role in the exchange of ideas.[97] Tr. 877–79 (Wheatley). Several of these lists are compiled each day to prevent reliance on any one person's judgment. Tr. 877–78 (Wheatley). Wheatley testified that, in fact, the stories suggested by writers are frequently put on the air.[98] Tr. 878–79 (Wheatley). Often it is the writers, since they are the ones "responsible for keeping up," [99] who are the first to notice late breaking developments or an important story that has been overlooked. Tr. 886 (Wheatley). The writers are expected to flag new developments throughout the day, including during the newscast and make necessary changes or create new copy and get it to the anchor. Tr. 885–86 (Wheatley); 1461–63, 1465 (Gould).

NBC's witnesses disputed Freeman's testimony that preparing the digests, or "News at This Hour" is "routine editorial work." *See* Tr. 56 (Freeman). According to NBC, the digests are "self-contained news programs," in which "prominent NBC news on-air personalities present brief reports about significant news stories"; they are a "showcase for NBC News talent." Def.Br. at 23. Producing the digest requires the writer to become familiar with all of the available stories, choose and select the stories that will be included, write the stories, decide what tape, pictures or graphics to use, work with the

anchor and serve a control room producer [100] in supervising the director and other technicians who participate in the broadcast. Tr. 1866 (Deitch). Deitch testified that he rarely shows his scripts to the news editor or anyone else, that the writer has virtually complete discretion to select the tape or graphics that are used and, for all practical purposes, is fully responsible for both the content and appearance of the broadcast. Tr. 1866–67, 2039–42 (Deitch). According to Deitch, "[i]f I don't like the reading * * * of the script, I'll tell the director to tell the talent to do it again." Tr. 2039 (Deitch). Producing these programs, according to Deitch, is a "one-man show." [101] Tr. 1867 (Deitch).

### III. *Testimony Pertaining to Brown*

#### *Domestic Producer*

As noted above, Brown served as the domestic producer on *Weekend Nightly News* from September 1983 through January 1990. For most of that period, Brown was supervised by Chesleigh and Sullivan. NBC contends that as domestic producer of *Weekend Nightly News,* Brown held "one of the most responsible producer positions in the NBC network news organization." Def.Br. at 35. Brown's position was virtually identical to the position of the domestic producer on *Nightly News,* which, for most of the period relevant to this litigation, was held by Chesnutt.[102] Tr. 1611–12 (Sullivan); 1666, 1669–70 (Chesnutt). As domestic producer, Brown was

**97.** Wheatley testified that he once criticized Freeman for not being selective enough in the preparation of his list. Wheatley stated that Freeman's list "wasn't helping me to the extent that I wished to be helped in terms of making some judgment." Tr. 879 (Wheatley); *see also* Tr. 1468–69 (Gould).

**98.** Gould testified that at least one item on Freeman's list ends up on the broadcast each day. Tr. 1468 (Gould). Deitch testified that he is sometimes assigned to cover stories that he has recommended and that he therefore plays a role in choosing the stories he writes. Tr. 2022 (Deitch).

**99.** Wheatley testified that the process of keeping up with the news, or "reading in," aids Freeman in the preparation of his list of domestic stories; however, according to Wheatley, reading the wires is also a necessary component of the writ-

ing Freeman does for the program. Tr. 876–77, 946–48 (Wheatley). Deitch testified that the primary reason he reads the wires is not to prepare his list, but to familiarize himself with stories he thinks he will be working on that night. Tr. 1869–70 (Deitch).

**100.** According to Deitch, "it is the same atmosphere as the live show control room." Tr. 2039–41 (Deitch); *see infra* p. 1149.

**101.** Deitch acknowledged that he does not receive "producer's credit" for preparing the digests. Tr. 2038–39 (Deitch).

**102.** Chesnutt is also familiar with the position of domestic producer on *Weekend Nightly News* because he has substituted for Brown under Chesleigh, Sullivan and Terenzio. Tr. 1667–68 (Chesnutt).

responsible for the generation, creation and conceptualization of domestic story ideas, the development, oversight and approval of domestic stories produced in the field by correspondents and field or segment producers, and the coordination and editing of these stories. Def.Br. at 36; *see also* Tr. 840–41 (Wheatley); 1446–49 (Gould).

Although the domestic producers on both *Nightly News* and *Weekend Nightly News* are expected to suggest and develop story ideas,[103] this function is particularly important on the weekend program because most of the bureaus virtually shut down on Saturday and Sunday. Tr. 1621–22 (Sullivan). Accordingly, the weekend domestic producer must initiate contact with correspondents to make specific plans for the coverage of weekend stories. Tr. 1616–18, 1621–22 (Sullivan). Unless the domestic producer aggressively pressures the bureaus for stories, and keeps in close contact with the correspondents involved, weekend stories may be forgotten and never reach the air. Tr. 1621–22 (Sullivan). Sullivan testified that he had frequently urged Brown to take greater initiative in "bugging the bureaus for stories," and suggesting story ideas to correspondents. Tr. 1622–23, 1643 (Sullivan).

According to Sullivan, once the decision has been made to cover a particular news item, the domestic producer becomes the "shepherd" of the story.[104] Tr. 1619 (Sullivan). NBC's witnesses strongly disagreed with Brown's characterization of his function as "relaying" to correspondents the assignments and instructions of the executive producer.[105] Several NBC witnesses testified that the domestic producer also explains to correspondents what the show is looking for in terms of the "shape" and "meaning" of the story, or how it ought to be "played." Tr. 840–41 (Wheatley); 1620–21 (Sullivan); 2183, 2187 (Chesleigh). Sullivan described the domestic producer as "the point man for the

domestic story," who must maintain an ongoing dialogue with correspondents in the field. Tr. 1619–20, 1632 (Sullivan); *see* Tr. 1671–74 (Chesnutt). Sullivan testified that contrary to Brown's testimony that he merely relayed the executive producer's assignment and waited for the correspondent's script, he (Sullivan) had personally observed Brown monitoring the development of the story by talking to the field during the entire process. Tr. 1623–24 (Sullivan); *see also supra* note 46 (Brown's participation in story on Avianca crash).

The domestic producer has the additional responsibility and authority to grant "script approval" on stories prepared by correspondents. Tr. 1449–50 (Gould); 1629–30 (Sullivan). Traditionally at NBC, no mechanical editing of videotape is permitted to take place in the field without prior script approval from New York. Tr. 1629–30 (Sullivan). Although the executive producer has final authority over all scripts, this authority is frequently "ceded" to the domestic producer because of time constraints. Tr. 1629–31 (Sullivan). Sullivan testified that correspondents' scripts were edited for "style," "structure" and "pungency of language," as well as grammar, accuracy and understanding. Tr. 1625 (Sullivan); *see* Tr. 408–09, 416–17 (Brown). Sullivan disagreed with Brown's testimony that the editorial function of the domestic producer is similar to that of a newspaper copy editor. Tr. 1627 (Sullivan). Sullivan testified that a newspaper copy editor "would die under the pressures of being a domestic producer of Weekend Nightly News," which involves "screening pieces, talking to the tape room and dealing with the content of the stories that you are in charge of in * * * 30 seconds." Tr. 1644–45 (Sullivan).

Once the script is approved by the domestic producer, and the piece is completed by a

---

**103.** Chesnutt described in detail his role in the development of correspondents' reports on the "cola wars" between Coke and Pepsi (Tr. 1708–11), and on the marketing of "Uptown" cigarettes to Blacks (Tr. 1680–92). *See* NBC Exs. BY, BZ (videotapes of reports as broadcast).

**104.** Chesnutt testified that he sometimes commits NBC resources to a story without prior

approval from the executive producer. Tr. 1698–1700 (Chesnutt); *see also* Tr. 1559 (Gould) (foreign producer usually consults with executive producer on major expenditures, but has authority to order satellites without prior approval).

**105.** *See, e.g.,* Tr. 426 (Brown).

correspondent, the domestic producer must make certain that the finished piece is fed into the studio in New York, timed, reviewed, and ready to be aired at the designated time. Tr. 1631–32 (Sullivan); 1450–52 (Gould); 1677–79 (Chesnutt). The domestic producer is expected to look at every frame of every domestic piece. Tr. 1632 (Sullivan). Although the executive producer tries to review all completed domestic stories, the "latest entries on the domestic side may very well be screened only by the domestic producer." Tr. 1632 (Sullivan); see also Tr. 1451–52 (Gould); 1713 (Chesnutt).

Sullivan questioned whether Brown was "totally serious" when he testified that he doesn't "pay too much attention to the picture" (see Tr. 494–96, 506–09). Tr. 1628 (Sullivan) Sullivan explained:

When you are reading the script, you don't ask, "Did you pan left or right?" * * *

If you read and can tell that the script is fudging, that they didn't get the key pictures so they are kind of writing around the lack thereof, you say, "Do you have a picture of the guy doing this or not doing that?" And I am absolutely sure Bernie Brown asks that question every time.

Tr. 1628–29 (Sullivan).

*Senior Producer*

Wheatley described the senior producer as the "strong right hand of the executive producer," and "the person [who] works most closely in coordinating the news from Washington and how it's presented on the program." Tr. 821 (Wheatley); 1446, 1466 (Gould). The senior producer also edits anchor scripts written by the newswriters, and serves as control room producer. Tr. 1454–

55, 1467 (Gould); 1632–34 (Sullivan). The control room was vividly described by Gould, as "frantic," even on relatively calm days.[106] Tr. 1454–60, 1560–61 (Gould). Although there is a second-by-second show script, changes are made during the broadcast from the control room almost every night. Tr. 1457 (Gould). For example, if a story does not arrive in time for its scheduled place in the broadcast, the senior producer must decide instantly what to do and communicate the change to the anchor, prompter and broadcast director. Tr. 1456–57, 1563 (Gould). On some nights, "you can throw the routine out the window." Tr. 1563 (Gould). The executive producer frequently provides instructions to the control room producer prior to the broadcast regarding how changes are to be made, such as a "kill list," and also has a direct line to the control room. Tr. 1637, 1639 (Sullivan).[107] The senior producer, however, must often make decisions without direction from the executive producer because things are happening too quickly to permit consultation.[108] Tr. 1459–60 (Gould); 1637–38 (Sullivan). Sullivan testified that the control room producer must exercise "independent judgment," including "news" judgment, as well as "technical," "practical" and "editorial" judgment. Tr. 1638–39 (Sullivan).

IV. *Testimony Pertaining to Garner*

The testimony pertaining specifically to Garner came primarily from WNBC witnesses Walker, Friedland, Moll and Yoakum (called by NBC) and Miller and Ryttenberg (called by plaintiffs).

NBC's witnesses generally confirmed Garner's description of the elements of his work.

106. Gould testified that the role of control room producer was accurately depicted in the motion picture "Broadcast News." Tr. 1438, 1454–60 (Gould).

107. Gould explained:

I know in my head, when I go into the control room, I know whether we are heavy or not. What I try to do, frankly, before I'll kill an item in the control room, I will edit copy down further of the existing pieces before I'll kill a whole item. So I might take phrases within pieces and tell Tom [Brokaw] and the teleprompter and the director, "Drop this phrase, drop that phrase," and you can save seconds that way. I prefer to do that than to ruin the pacing of the show.
Tr. 1562 (Gould).

108. Sullivan gave the following example:

There's an audio problem, you shout at the audio man. You've got to cut a live cross talk. There's a lot of decision making going [on] in the control room that if the executive producer tried to do from the news room by the phone, the show would go down the tubes. There's a lot of responsibility in the control room.
Tr. 1638 (Sullivan).

NBC acknowledged that Garner does not pick his daily assignments or make the final decisions regarding which stories will be covered and broadcast. *See, e.g.,* Tr. 1417, 1420 (Friedland); 2552–53, 2721–22 (Walker). However, Garner does suggest stories that may ultimately be put on the air. Tr. 2712–13 (Walker). According to Walker, a field producer gathers, develops, shoots, writes and edits a news story in the field but does not appear in the broadcast. Tr. 2560 (Walker). Or, as WNBC executive producer Clare Friedland put it, "it is the field producer's responsibility to gather all the elements that would be necessary for having a story that's ready to be put on the air." Tr. 1380 (Friedland); *see also* Tr. 853 (Wheatley); 2560–65 (Walker); 1047 (Frank). Friedland described the field producer as "the boss of the story when he's out in the field." Tr. 1381 (Friedland). Yoakam explained that "the reason the field producer position was developed was to keep more editorial control closer to the story, in the field. * * * [T]he field producer is absolutely essential to get that control on the scene, to be the point person on the story * * *; [he] is a very important part of the editorial function." Tr. 2488–89 (Yoakam). This responsibility is shared when a correspondent is also assigned to the story. Tr. 2562–64 (Walker).

Walker acknowledged that field producers receive instructions in the field from the assignment desk, and that at times there can be contact every five or ten minutes for periods of an hour or more. Tr. 2694 (Walker). Friedland testified, however, that management does not give the field producer directions as to what types of shots to get in the field. Tr. 1381 (Friedland). The field producer shares this role with the cameraman,[109] but the cameraman must follow the field producer's directions. Tr. 1381 (Friedland); 2564–65 (Walker).[110]

Friedland emphasized that daily deadlines do not permit management to review all the information the field producer has obtained in the field in order to determine whether the most interesting facts have been used. Tr. 1390 (Friedland). Management must "rely on the field producer's judgment to a great extent." Tr. 1391 (Friedland); *see also* Tr. 2489–90 (Yoakam). Accordingly, the show producers regularly solicit the field producer's opinion regarding the value of a story. Tr. 1385 (Friedland). Although the field producer does not make final decisions, he is expected to evaluate the news event and make recommendations to management regarding appropriate coverage. Tr. 1385–86 (Friedland); 2559 (Walker).

Friedland acknowledged that field producers are required to call in when they believe that they have finished their story. Tr. 1383–84 (Friedland). Friedland explained that the show producers need to

> know how important or good a story is, whether it is important because of just its inherent news story or it's got great visuals or people got into an argument and it is very exciting. Show producers need to know that so that they know how to routine their shows, where to put the story in the program.

Tr. 1384 (Friedland).

After the field work is completed, the field producer is frequently responsible for writing the story, cutting the videotape, and doing whatever is necessary "to make sure that * * * story gets on the air." Tr. 1385 (Friedland). Before the field producer begins writing and editing the videotape, he consults with the show producers about "what kind of story he has" and "how much

---

109. Friedland also testified that a camera crew is sometimes sent out alone to cover a story. Tr. 1382–83 (Friedland). A field producer is sent out in addition to a camera crew "[i]f a story seems more complicated and it needs to have * * * a set of eyes and ears there to make sure that certain information is gathered, * * * to dig into a story because we feel that there is something beneath the surface." *Id.*

110. Friedland testified that as a field producer she often directed the cameraman to take specif-

ic shots. She acknowledged, however that at some point the field producer can just leave the cameraman alone, round up interviews and facts, and have the cameraman shoot on his own. Tr. 1410 (Friedland). Friedland also acknowledged that some types of stories dictate what picture is available, but insisted that it often "depends on what the field producer as a journalist on the scene of a story perceives to be the angle that he's pursuing." Tr. 1411–12 (Friedland).

time he thinks he needs for the story versus how much time the show producer has just assigned to the story. So there's a bit of a bargaining process that goes on, sort of * * * haggling."[111] Tr. 1385–86 (Friedland). Although the field producer is told the length and format of the story, he is generally not given any specific guidance regarding the content of the story or the sound and pictures to be used.[112] Tr. 1388 (Friedland).

Walker stressed the importance of presenting memorable and interesting newscasts that use effective storytelling and "honestly go for emotion." Tr. 2554–56 (Walker). According to Walker, "it's our role as agenda setters to * * * weed through the huge amounts of information and * * * select which information goes before our viewing audience," a role which requires constant analysis and evaluation of complex facts and issues. Tr. 2554–55 (Walker). Garner may not, however, offer his personal opinions or conclusions.[113] See Tr. 2700–02 (Walker).

Walker acknowledged that WNBC does not report the news differently than local news stations in Houston or Tulsa, and that WNBC reporters do not analyze, evaluate, or interpret the news more than those stations. Tr. 2693 (Walker). She also acknowledged that newspapers, radio, magazines and wire services, as well as television news, try to convey emotion and use effective story telling. Tr. 2720 (Walker). Walker testified, however, that WNBC has more "polish," and that the "quality" of journalism is higher in New York. Tr. 2693, 2704–05 (Walker).

When supervising editing, the field producer may give specific instructions or general "guidelines" to a videotape editor as to how the tape should be cut. Tr. 1391, 1415–17 (Friedland). The choice of tape should be "interesting" and "dramatic," and the field producer is expected to make sure that the end product contains the best possible footage and sound bites. Tr. 1392, 1415 (Friedland). Although the field producer may ask a tape editor to choose a piece of videotape, and although the tape editor does the "actual button pushing," the field producer retains final editorial responsibility for the piece. Tr. 1391–92, 1415–17 (Friedland); Tr. 2568 (Walker). Frank described editing as "the process of picking the pictures that are relevant to the story and arranging the flow, the juxtaposition." Tr. 1050 (Frank). It is not, as Garner testified, "cut and dried."[114] Tr. 2501 (Yoakam). The field producer's work in the editing room is virtually unsupervised. See Tr. 1390–91 (Friedland).

NBC disputed Garner's testimony that the content of his work is dictated to a large extent by time constraints and predetermined show "formats."[115] See Tr. 1587 (Moll) ("format doesn't dictate how something is written"); 2558 (Walker) (format does not determine editorial content). Friedland described a "loose structure," common to the programs produced each day, that requires every news story to begin and end with an anchor person on camera. Tr. 1421 (Friedland). The story starts with an anchor person on camera, who reads a lead-in to either a reporter's package, a piece that the anchor has previously recorded or a tape

111. The field producer may argue that the story is especially interesting or so complicated that it will take a certain amount of explanation to present in a manner that the audience will understand. Tr. 1386–87 (Friedland). The field producer may also raise "fairness concerns" and need additional time to present both points of view on a story. Tr. 1387 (Friedland).

112. Field producers occasionally seek Friedland's guidance, or use her as a "sounding board." Tr. 1388 (Friedland).

113. Garner testified that the phrases "legal and financial trickery" and "unsavory deals" in his intro to "Surviving the Stay in the Hospital"—which NBC pointed to as examples of analysis and interpretation, were taken from correspon-

dent's Mike Taibbi's scripts and interviews. See Tr. 798–800, 1185–86, 1320–22 (Garner); Garner Ex. 7.

114. Friedland stressed that it is difficult for print journalists to make the transition to television news because print people are used to writing in a very different style (for example, using longer sentences), and do not have experience putting words and "visuals" together. Tr. 1401 (Friedland).

115. Walker acknowledged that management, not Garner, sets and implements news policy for WNBC, determines the style or format of the newscasts, the look of the set, the placement of graphics, and the number of anchors. Tr. 2715–18, 2554 (Walker).

**1152**

prepared by a field producer. Tr. 1398 (Friedland). Every story is followed by an on-camera tag read by the anchor that "kind[] of wraps the story." Tr. 1398 (Friedland); *see also* Tr. 1586–87 (Moll) (format is the "skeleton * * * on which the stories are hung to flesh out the full broadcast"). Within this structure, "there are different ways that the story can be presented." Tr. 1421 (Friedland); *see also* Tr. 1398–99 (Friedland); 2719 (Walker). In fact, Friedland testified, NBC does not want its news programs to "have a sameness to them. We do like * * * our programs to look different." Tr. 1396 (Friedland).[116]

When the field producer has completed the script for a news story, it is reviewed and possibly edited by the associate producer or producer, and usually the assistant news director. Tr. 1389–90, 1412–13 (Friedland). The script (and occasionally the completed tape) may be reviewed by the executive producer prior to broadcast if it is a "sensitive story" or raises "legal concerns." Tr. 1389–90, 1394–95 (Friedland). Generally, however, daily deadlines require WNBC to rely heavily on the "judgment" and creativity of individual field producers. Tr. 1390–91, 1396–97 (Friedland).

NBC introduced into evidence and played at trial a number of examples of Garner's work, including part of the award-winning sweeps series, "Surviving a Stay in the Hospital," produced with correspondent Mike Taibbi. Tr. 1329–30; Def.Ex.BL.[117]

To illustrate NBC's contention that the job of field producer requires talent and imagination, Walker compared police funeral stories prepared by Garner and by WNBC correspondent Perri Peltz. NBC Ex. DF; Tr. 2571, 2575–81, 2705–12 (Walker). Walker was "disappointed" with Peltz's story, Tr.

2575, but thought Garner's "showed an example of how you take a routine story and make it beautiful." Tr. 2580 (Walker). Walker observed, for example, that Peltz "talked over virtually every part of [the] story," whereas Garner let natural sound—"the bells, the drum beat, the sobbing of the widow"—tell the story. Tr. 2577–79 (Walker). According to Walker, knowing how to match the words with the pictures and when to use natural sound is "a talent that some people have, and Bob has it * * * and Perri doesn't." [118] Tr. 2579 (Walker). At the same time, however, Walker conceded that certain elements are expected in every police funeral story, such as the playing of taps, the line of police officers, the widow, and officials' expressing outrage. Tr. 2576, 2579 (Walker). She also acknowledged that WNBC broadcast the Peltz story despite its deficiencies, that Peltz has remained a correspondent, and that she is receiving additional training to improve her work. Tr. 2725–26 (Walker).

### DISCUSSION

Narrowly construed, the FLSA exemptions exclude from overtime coverage only those employees who fall "plainly and unmistakably" within their terms. Based on the evidence presented at trial, I find that NBC has failed to prove by a preponderance of the evidence that plaintiffs are exempt as administrative or professional employees. As a result, I conclude that plaintiffs are entitled to have their fees included in their wage base for purposes of calculating overtime.

In reaching this conclusion, I have been both aided and ultimately persuaded by the analysis of the district and circuit courts in *Dalheim.* Of course, as those decisions repeatedly remind us, the determination of whether an employee is exempt is "principal-

---

116. Friedland noted that writers and field producers are frequently required to prepare two different versions of the same story for the five o'clock and six o'clock programs. Tr. 1396 (Friedland).

117. Garner testified that Taibbi did "[t]he actual writing, everything you saw on tape was Mike Taibbi." Tr. 1355 (Garner). Garner provided the "raw information that found its way into Mike's piece." Tr. 1356 (Garner). Garner also contends that the other examples of his work are

not representative of his everyday assignments. Pl.Br. 71–72.

118. Garner testified that the story selected by WNBC was "among the most emotional that I have ever done," and not a representative sample of the majority of his work. Tr. 2778 (Garner). He also asserted that some of the differences identified by Walker were a product of his greater experience, rather than talent or imagination. Tr. 2779 (Garner).

ly one of fact," 706 F.Supp. at 495, that the inquiry into exempt status is "intensely fact-bound and case specific," 918 F.2d at 1226, and that "[e]ach case must be judged on its own peculiar facts." 918 F.2d at 1227. I find, however, that the tasks performed by reporters, producers, editors and directors at KDFW, and their role in the production of a newscast, are virtually indistinguishable from those performed by the plaintiffs in this case.[119] Significantly, NBC does not contend that the functions performed by the *Dalheim* plaintiffs differ in kind from those performed by the plaintiffs in this case. Rather, NBC distinguishes this case from *Dalheim* primarily on the ground that "KDFW, unlike NBC, imposed substantial creative restraints on its reporters and producers." Def. Reply at 33.[120] With these general observations in mind, I turn to the application of the FLSA to the specific facts of this case.

## I. *Administrative Exemption*

█ The first prong of the short test requires that an administrative employee's primary duty consist of "work directly related to management policies or general business operations." 29 C.F.R. §§ 541.2(e)(2), 541.-214(a). The interpretations instruct that such work includes "those types of activities relating to the *administrative* operations of a business as distinguished from '*production*.'" 29 C.F.R. § 541.205(a) (emphasis added). As the Fifth Circuit held in *Dalheim*, "[t]he distinction § 541.205(a) draws is between those employees whose primary duty is administering the business affairs of the enterprise from those whose primary duty is producing the commodity or commodities, whether goods or services, that the enterprise exists to produce and market." *Dalheim*, 918 F.2d at 1230 (footnote omitted). "The regulations contemplate that administrative work includes advising management, planning, negotiating, representing and promoting the company." *Dalheim*, 706 F.Supp. at 507 (citing § 514.205(b)).

The interpretations further provide that

the phrase "directly related to management policies or general business operations" is not limited to persons who participate in the formulation of management policies or in the operation of the business as a whole. Employees whose work is "directly related" to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out. The phrase also includes a wide variety of persons who either carry out major assignments in conducting the operations of the business, or whose work affects business operations to a substantial degree, even though their assignments are tasks related to the operation of a particular segment of the business.

29 C.F.R. § 514.205(c). The interpretations recognize that "[i]t is not possible to lay down specific rules that will indicate the precise point at which work becomes of substantial importance to the management or operation of a business." 29 C.F.R. § 541.-205(c)(1).

I conclude, for substantially the reasons stated by the district and circuit courts in *Dalheim*, that the plaintiffs' work relates essentially to producing the primary product of a broadcast news organization, *i.e.*, an individual newscast or news program, rather than to defendant's administrative operations. Plaintiffs' duties and responsibilities simply do not include the types of administrative tasks noted in 29 C.F.R. § 541.205(b), such as setting business policy, planning the news division's long-range objectives, promoting the newscast or negotiating salary or benefits with other personnel. *See Dalheim*, 918 F.2d at 1231. I find that although each of the plaintiffs has some responsibility for keeping abreast of news events and advising their executive producers of potential stories, this aspect of their responsibilities relates primarily to the production of a particular newscast and not "to management policies or

---

**119.** Although *Dalheim* did not include newswriter plaintiffs such as Freeman, the functions performed by Freeman were substantially addressed in the context of determining the exempt status of reporters and editors.

**120.** NBC also contends that *Dalheim* misread the applicable law with respect to the administrative exemption. Def.Br. at 106, 108.

general business operations." 29 C.F.R. §§ 541.2(e)(2), 541.214(a).

Nor has defendant demonstrated that plaintiffs' production functions affect business operations "to a substantial degree." 29 C.F.R. § 541.205(c). As in *Dalheim*, the only proof that plaintiffs' work is of substantial importance to the management or operation of the NBC/WNBC news organization is that poor performance by plaintiffs would weaken defendant's competitive position, eventually resulting in a loss of advertising revenue. *See Dalheim*, 918 F.2d at 1231. But "the fact that a worker's poor performance may have a significant profit-and-loss impact is not enough to make that worker an exempt administrator." *Id.* It simply cannot be disputed that with rare exceptions, the efforts of the NBC plaintiffs are focused exclusively on the production of a particular newscast, and not the kind of work that is of substantial importance to defendant's general management and business operations, "such as setting news department policy and designing the uniform 'look' of the newscast." *Id.; see* Tr. 2715–18, 2554 (Walker). Defendant has therefore failed to prove that plaintiffs' primary duties consist of "work directly related to management policies or general business operations." 29 C.F.R. §§ 541.2(e)(2), 541.214(a).[121]

Since defendant has failed to satisfy the first prong of the administrative short test, it is unnecessary to reach the second prong, which requires the exercise of discretion and independent judgment. I therefore conclude that plaintiffs are not exempt as administrative employees.

II. *Professional Exemption*

Defendant contends that plaintiffs are exempt as professionals. I find, however that NBC has failed to establish that plaintiffs may be excluded from the FLSA overtime provisions as either "learned" or "artistic" professionals.

A. Learned Professionals

██ In order to satisfy the short test for learned professionals, an employee's primary duty must consist of "work requiring knowledge of an advanced type in a field of science or learning." 29 C.F.R. §§ 541.3(e); 541.-315(a). "Advanced" knowledge is different than knowledge acquired through an apprenticeship or as a result of a general academic education. 29 C.F.R. § 541.3(a)(1). Advanced knowledge is "customarily acquired by a prolonged course of specialized intellectual instruction and study." 29 C.F.R. § 541.302(d). The word "customarily" implies that in the vast majority of cases, "specific academic training is a prerequisite for entrance into the profession." *Id.*

As in *Dalheim*, the evidence presented at trial in this case

demonstrates that many aspects of broadcast journalism are now professional in nature. There are, throughout the country, numerous undergraduate and several graduate degree programs devoted either to broadcast journalism/mass communications alone or to journalism generally, with a concentration in broadcast journalism. Many broadcast journalists now obtain undergraduate degrees before seeking full-time employment. Broadcast journalists attempt to conform their work to established standards of ethics.

*Dalheim*, 706 F.Supp. at 502; *see* Tr. 2113–35 (Hoyt); Def.Br. at 97–105. However, defendant has failed to prove that a particular

---

**121.** In support of its position, NBC cites two cases where editors were found to be administrative employees. Def.Br. at 106–08. These cases are distinguishable from the instant case, however, based on each editor's broad responsibility for the overall make-up of the publication involved. *See Adams v. St. Johns River Shipbuilding Co.,* 69 F.Supp. 989 (S.D.Fla.) (editor "conceived and executed the general make-up of the publication"), *rev'd on other grounds,* 164 F.2d 1012 (5th Cir.1947); *Donovan v. Reno Builders Exch., Inc.,* 26 Wage & Hour Cas. (BNA) 1234, 1984 WL 3149 (D.Nev.1984) (editor "solely in charge of editing the publishing the weekly trade periodical"). NBC also cites *Sprague v. United States,* 677 F.2d 865, 230 Ct.Cl. 492 (1982), which held that postal inspectors are administrative employees within the meaning of 29 U.S.C. § 213(a)(1). Def.Br. at 108. However, the responsibilities of these inspectors, including enforcement of postal laws, maintaining security, training new personnel and "developing and implementing new programs," bear little resemblance to the responsibilities of the plaintiffs in this case.

academic degree, reflecting a prolonged course of specialized study, is a "prerequisite" for entrance into the field of journalism generally or broadcast news in particular. Significantly, it is undisputed that neither NBC nor WNBC requires any specific academic degree, certification or examination for employment as a broadcast journalist. Tr. 2441 (NBC director of labor relations Wendy Freedman); *see* Tr. 1430–31, 1996–97, 2706–07, 2736–37, 2751 (testimony regarding educational background of employees Gould, Deitch, Miller, Ryttenberg and Peltz);[122] *see also supra* note 20 ("cross-over" provisions proposed by NBC permitting engineering staff to perform certain newswriter functions).

As noted above, the interpretations state that the learned professional exemption is not available for such "quasi-professions as journalism," 29 C.F.R. § 541.302(d), and that, with rare exceptions in highly technical fields, newspaper writers "do not meet the requirements * * * for exemption as professional employees of the 'learned' type." 29 C.F.R. § 541.303(f)(1). While print and broadcast journalism today may possess more of the attributes of a learned profession than they did at the time the interpretations were issued, it is still the case that employment in these fields is not dependent on the type of prolonged course of specialized instruction characteristic of such recognized professions as law, medicine, nursing, accounting, engineering, architecture, teaching and the sciences. *See* 29 C.F.R. § 541.-302(e)(1); Freeman Ex. 26 (report of study of entry level hiring in broadcast journalism which concluded that "[a]n applicant's chances of being hired appear to be about

the same whether he or she majors in broadcast news, another communication area or an area outside communication"). Rather, the record before me demonstrates that experience and on-the-job training still play such a substantial role in the training of journalists generally, and broadcast journalists in particular, that the interpretations—despite their age—remain persuasive in the context of modern broadcast journalism. I therefore find that NBC has failed to establish that plaintiffs' primary duties consist of "work requiring knowledge of an advanced type in a field of science or learning." 29 C.F.R. § 541.3(e); *see Dalheim,* 706 F.Supp. at 502.

Since NBC has failed to meet the first prong of the short test for the learned profession exemption, it is unnecessary to reach the second prong, which requires "the consistent exercise of discretion and judgment." 29 C.F.R. §§ 541.3(e), 541.315(a).

### B. Artistic Professionals

█ The short test for a professional of the artistic type is satisfied when an employee's primary duty "consists of the performance of work requiring invention, imagination, or talent in a recognized field of artistic endeavor." 29 C.F.R. §§ 541.3(e), 541.315(a). According to the interpretations, work of this type must be both "original and creative."[123] 29 C.F.R. § 541.303(a). The interpretations, as well as the limited case law, instruct that under some circumstances journalism, including broadcast journalism, can qualify as work "in a recognized field of artistic endeavor," and that journalists may be found to be exempt artistic professionals on the basis of appropriate evidence. *See Dalheim,* 918 F.2d at 1228; *Dalheim,* 706 F.Supp. at 505.[124]

---

**122.** According to plaintiffs, senior commentator John Chancellor does not have a college degree, and Tom Brokaw's counterpart on ABC, Peter Jennings, is not a high school graduate. Pl.Br. at 127.

**123.** NBC points out that "originality and creativity" are not "specific requirements" under the short test for artistic professional. Def.Br. at 69, 120; Def.Reply at 20. While this is technically correct, originality and creativity are unquestionably among the defining characteristics of "artistic endeavor," and of "invention, imagination or talent" in writing. Accordingly, the courts, like the interpretations, have treated originality and

creativity as an integral part of the artistic professional exemption even when applying the short test. *See, e.g., Dalheim,* 918 F.2d at 1228–29; 706 F.Supp. at 503–06; *Sherwood,* 871 F.2d at 1148; 677 F.Supp. at 10.

**124.** *See also* Def.Reply at 24–25, Ex. B (letter from Administrator stating that Department of Labor has held that certain reporters who cover legislative developments in Congress are doing professional work within the meaning of the regulations because "they had the duty of obtaining necessary information much of which is of a highly specialized character, interpreting it and putting it into words so that the man in the street

In the field of writing, the interpretations state that the artistic test is met by "essayists or novelists or scenario writers who choose their own subjects and hand in a finished piece of work to their employers." 29 C.F.R. § 541.303(c)(2). By contrast, the interpretations state that "the majority of reporters do work which depends primarily on intelligence, diligence, and accuracy." 29 C.F.R. § 541.303(d). "The reporting of news, the rewriting of stories received from various sources, or the routine editorial work of a newspaper is not predominantly original and creative in character * * *." 29 C.F.R. § 541.303(f)(2). Therefore, collecting facts about news events by investigation, interview or personal observation, and then writing stories for publication based on these events, is nonexempt work. *Id.* Only "analytical, interpretative or highly individualized" writing is considered creative and the only newspaper writers commonly performing such work are "editorial writers, columnists, critics, and 'top-flight' writers of analytical and interpretative articles." 29 C.F.R. § 541.-303(f)(1).

Like the defendant in *Dalheim*, NBC asserts that the Secretary's interpretations should have little if any application to this case because they deal "exclusively" with certain newspaper writer jobs existing in the 1940's. Def.Br. at 2–3, 114–17; Def. Reply at 1–2, 18–21; *see Dalheim*, 918 F.2d at 1228. I disagree. As the *Dalheim* courts held, the interpretations, while not binding, can be helpful in determining Congressional intent, and can provide analogies that are useful in "distinguish[ing] between those persons whose work is creative in nature from those who work in a medium capable of bearing creative expression, but whose duties are nevertheless functional in nature." *Dalheim*, 918 F.2d at 1229 (footnote omitted); *see also id.* at 1228.

As an alternative to its assertion that the interpretations are outdated and wholly inapplicable to broadcast journalism, NBC argues that the work performed by plaintiffs is more akin to the work of "editorial writers, colum-

nists, critics, and 'top flight' writers of analytical and interpretative articles" than the nonexempt reporting, rewriting, and editing performed by the majority of print journalists. Def.Br. at 120–21; Def. Reply at 26–27.

NBC contends that plaintiffs' primary duty is to develop and create engaging and interesting news stories, which requires judgment, selectivity, creativity, invention and a high degree of talent. Def.Br. at 77–79, 80–96. NBC further argues that the work performed by plaintiffs demands greater creativity and talent than print journalism because "in television, a newswriter or producer must decide how best to structure and blend both words and pictures to tell a story within very limited time constraints. The television writer and producer must achieve an immediate impact and immediate understanding. His viewer, unlike a newspaper reader, cannot go back and 'reread.' " Def. Reply at 21–22. NBC also contends that although none of the plaintiffs writes editorials or commentary as such, plaintiffs are exempt because

> each of them must utilize most, if not all, of the same mental and creative processes which are used by such exempt newspaper writers. Each must analyze substantial amounts of complex information derived from a variety of sources, including original sources; each must interpret that material to give it meaning for NBC viewers; each is compelled to make a number of difficult choices about what to include and how to express it in the most engaging manner possible; and each must "individualize" his treatment of such material in the course of creating a visual news story expected to have flair, vitality and distinctiveness.

Def. Reply at 26.

 As several of NBC's witnesses acknowledged, *all* nonfiction writing requires the writer to select and impose a structure upon facts; moreover, virtually all journalistic writing is designed to some extent to interest, engage and entertain as well as to inform the reader or viewer. NBC's witnesses also found elements of analysis and

---

can read and understand the course of events in the Congress"). I note that plaintiffs seek the assistance of specialized correspondents when

writing about technical fields such as science, economics or law. Tr. 29–30 (Freeman); 798 (Garner).

interpretation in (presumably nonexempt) wire copy. Accordingly, many of the attributes of plaintiffs' work that NBC argues are found in the work of editorial writers and top flight writers of analytic and interpretive articles, are also found in the work of the majority of clearly nonexempt print journalists. The question, therefore, is whether the *character* of plaintiff's work as a whole is defined to the same extent by invention, imagination, or talent as the work of "editorial writers, columnists, critics, and 'top flight' writers of analytical and interpretative articles."

Clearly, plaintiffs are "talented" in the sense that they have a native and superior ability in their fields; and, on occasion, plaintiffs' work is inventive and imaginative, and may demonstrate creativity and originality that rises to the level of artistry. Plaintiffs' work is also in some respects analytic and interpretive. I find, however, that the work performed by all three plaintiffs is predominantly "functional in nature," *Dalheim,* 918 F.2d at 1229, in that it depends primarily upon acquired skill and experience and does not depend to a sufficient extent upon invention, imagination or talent to qualify for exemption as the work of an "artistic" professional.

It cannot be disputed that the medium of television and the sophisticated technologies used in broadcast journalism make the jobs of broadcast newswriters and producers more complex and more demanding in certain respects than those held by most newspaper editors and reporters at the time the interpretations were issued. Obviously, print journalists are not required to acquire or master the techniques necessary to produce the combination of words, sound and pictures that constitutes a television news broadcast. The evidence at trial, however, demonstrated overwhelmingly that plaintiffs' primary duties, like those of the majority of print reporters, involve the collection of facts about news events, and writing, editing or producing stories for broadcast based upon those events. *See* 29 C.F.R. § 541.303(f)(2). Unlike editorial writers, columnists or critics, none of the plaintiffs chooses his subjects or is permitted to "editorialize" or inject into a story his personal opinion or point of view. Nor (with rare exceptions in Garner's case) are the stories they write or produce specifically attributed to plaintiffs on the air or in the show credits. It is also undisputed that plaintiffs' writing and editing are expected to conform to the style of the program as well as the style of a specific anchor, that all writing is edited by at least one and up to four superiors, and that Freeman's and Garner's editors cannot distinguish their work from that of other writer/producers. Nor is there any evidence that a story "produced" by Brown can be distinguished from the work of other domestic, foreign or senior producers. Plaintiffs' work is therefore clearly not "highly individualized." 29 C.F.R. § 541.303(f)(1).

I further find that plaintiffs' work product is not comparable to exempt "analytical" and "interpretative" articles. 29 C.F.R. § 541.303(f)(1). Having reviewed several hundred scripts and viewed a number of broadcasts written or produced in part by plaintiffs, I find that any "interpretative" or "analytical" element in their work is limited to selecting facts or providing context or explanatory background for a story—which is also commonly present in clearly nonexempt newswriting. I further find that the added element in television journalism of combining words and pictures does not require a significantly greater amount of invention, imagination or talent. Of course, there is an element of creativity involved in integrating words and pictures, just as there is an element of creativity in choosing the words and structure of a written script. However, the evidence showed that "editing" words and pictures, or "writing to picture" is largely an acquired skill that involves no more or less creativity than choosing the elements of the written story itself. Finally, I find that the time constraints under which plaintiffs work do not add measurably to the invention, imagination or talent required to perform their jobs, and, in fact, more frequently serve to limit opportunities for creativity and interpretation.

*Freeman*

Specifically with respect to plaintiff Freeman, I find that his primary daily responsi-

bilities as a newswriter involved collecting facts about news events from various sources, such as wire services or reporters covering particular events, and writing stories based upon that accumulated information. Although Freeman is expected to suggest story ideas, the subject matter and general format of Freeman's writing is ultimately determined by his superior—usually the executive producer, who may also direct the focus or angle of a particular story.[125] Freeman's creative options are further limited by the story itself or the content of a correspondent's report. Freeman is expected to conform his writing to established standards and styles; his writing is generally reviewed by up to four superiors, any one of whom may revise the story or return it to Freeman for re-writing. Notably, virtually all of Freeman's work product is itself to some extent rewritten from other sources, from which he frequently copies key words and phrases.

I further find that although there is obviously an element of subjectivity in Freeman's choice of words or perspective, he is not permitted to assert his personal point of view or judgment and that his writing is therefore not comparable to the highly individualized interpretive and analytic writing that the interpretations instruct is exempt. Rather, Freeman's writing is fundamentally objective reporting of the news, in which he relies primarily on his intelligence and the skills derived from many years of experience in journalism, and not imagination, invention or sheer talent. Notwithstanding NBC's insistence that Freeman is expected to produce creative and original writing, I find that the various constraints imposed upon Freeman so severely limit the kind of personal expression that distinguishes artistic from functional writing, that he must be found nonexempt.

*Brown*

Brown's primary functions as a producer consist of suggesting stories, editing correspondents' scripts, and coordinating news coverage. To the extent Brown functions as

a newswriter or editor, his creative options are subject to many of the same conditions and limitations that apply to Freeman. Most notably, Brown's writing consists almost exclusively of revising correspondents' scripts, and is therefore "most closely akin to that of the 'rewrite man' described in § [541.-]303(f)(2)." *Dalheim,* 706 F.Supp. at 506. With respect to the coordination of news coverage, Brown's work log, which I find fairly and accurately represents his daily activities, demonstrates that he functions primarily as a skilled and experienced contact person for correspondents and producers in the field. Although a broadcast producer provides editorial guidance and may occasionally make a creative or original contribution to a correspondents' report, Brown's primary activities as the "shepherd" of a story are constant monitoring of news developments and checking of facts, identification of additional leads and sources of information, and coordination of technical components such as satellites, supers and graphics. These tasks require diligence, persistence and organization, not invention and imagination. I further find that as control room producer, Brown largely implemented the directions of the executive producer, and that decisions required in the control room, while important, are typically based upon skill, experience and preparation, rather than artistry. Accordingly, Brown does not qualify for exemption as an artistic professional.

*Garner*

Nor do Garner's primary activities meet the requirements for exemption as an artistic professional. Although Garner has participated in the production of several award-winning sweeps series and other special projects,[126] it is undisputed that the vast majority of his time is spent gathering and reporting the news, sometimes covering three or four events in a single day. Garner may suggest stories, but does not choose his assignments, which are often smaller, less important stories that do not merit the assign-

---

**125.** I do not accept Freeman's testimony to the extent he claims that the specific words, phrases or organization of his writing are literally "dictated" by his superiors. *See, e.g.,* Tr. 26–27, 182–84, 193–95.

**126.** I agree with plaintiffs that the examples of Garner's work offered by NBC do not fairly represent Garner's primary activities as a field producer.

ment of an on-air correspondent. Like the print journalists described in the interpretations, Garner ordinarily collects information by investigation, interview or personal observation, and reports events in a standard form ranging from voice-over to correspondent or anchor package. *See Dalheim,* 706 F.Supp. at 505. Garner is in many respects broadcast journalism's version of a "beat reporter." Indeed, Garner often acts as a "legman," covering all or part of a news story and relaying facts and videotape back to the newsroom for inclusion in a report prepared by an on-air correspondent or writer. Of course, like all reporters, Garner must make decisions and judgments in the field regarding what to film and whom to interview. These decisions, however, are frequently dictated to a great extent by the nature of the assignment, and, for most stories, Garner uses a standard format of pictures and sound. Moreover, Garner must stay in constant contact with the assignment desk and may be given specific instructions by the show producers regarding the content or angle of a story. He may not commit WNBC resources, and cannot even work through his lunch hour, without management approval.

Although Garner makes recommendations regarding whether the stories he covers should be included in a newscast, and their length and format, the ultimate decision is made by management producers. Garner is not permitted to editorialize or express his personal opinion, and must conform his style to the anchor who will read his script. Finally, time limitations and the pressure of deadlines prevent truly creative editing on most stories. I therefore find that Garner's primary duties are functional rather than routinely original and creative and do not meet the requirements for exemption as an artistic professional.

In sum, although each of the plaintiffs in this case may perform work that is at times original, creative, or analytic, I find that the completion of their usual daily assignments depends primarily upon acquired skill and experience, as well as intelligence, diligence and accuracy, rather than invention, imagination, or sheer talent. 29 C.F.R. §§ 541.3(e),

541.303(d), 541.315(a). Accordingly, they are not exempt artistic professionals.

### III. *Willfulness*

Pursuant to 29 U.S.C. § 255(a), a cause of action under the FLSA must be commenced within two years after the cause of action accrued, unless the action arises out of a "willful" violation—in which case it must be commenced within three years after accrual. A cause of action for overtime compensation accrues at each regular payday immediately following the work period during which services were rendered and for which overtime compensation is claimed. *Mitchell v. Lancaster Milk Co.,* 185 F.Supp. 66, 70 (M.D.Pa.1960).

This action was commenced on April 30, 1985. Accordingly, plaintiffs may recover unpaid overtime from April 30, 1983, unless NBC's violation of the FLSA is willful, in which case plaintiffs would be entitled to unpaid overtime from April 30, 1982. A violation is "willful" if the employer knew or showed reckless disregard for whether its conduct was prohibited by the FLSA. *McLaughlin v. Richland Shoe Co.,* 486 U.S. 128, 133, 108 S.Ct. 1677, 1681, 100 L.Ed.2d 115 (1988). "Willful" refers to conduct that is voluntary, deliberate, intentional, and not merely negligent. *Id.*

I agree with the court in *Dalheim* that the application of the FLSA to broadcast journalism raises issues of first impression, and that NBC reasonably viewed the application of the FLSA to plaintiffs as at least a close question. *See Dalheim,* 706 F.Supp. at 511. I note in particular that NBC's position regarding plaintiffs' exempt status was supported by Judge Gesell's 1988 decision in *Sherwood.* I therefore find that NBC's failure to treat plaintiffs as exempt employees under the FLSA was not a voluntary, deliberate, and intentional violation of the FLSA.

### CONCLUSION

For the reasons set forth above, I find that NBC has failed to prove by a preponderance of the evidence that plaintiffs fall "plainly and unmistakably" within the terms of the

FLSA exemptions for professional or administrative employees, and therefore conclude that plaintiffs are entitled to have their fees included in their base pay for purposes of calculating their overtime. I find, however, that NBC's violations of the FLSA were not willful.

SO ORDERED.